[No. 27705. Department Two. February 23, 1940.]

QUEEN CITY CONSTRUCTION COMPANY, *Respondent,* v. THE CITY OF SEATTLE, *Appellant.*[1]

[1]Reported in 99 P. (2d) 407.

*A. C. Van Soelen, J. Ambler Newton,* and *C. V. Hoard,* for appellant.

*J. Speed Smith* and *Henry Elliott, Jr.,* for respondent.

BEALS, J.—The city of Seattle having called for bids for the construction of the Henderson street trunk sewer, unit No. 9, as authorized by ordinance No. 64831, the plaintiff, Queen City Construction Company, a corporation, submitted its bid, in accordance with the city's prepared proposals, subdivided into thirty-one distinct items, comprising estimated quantities, for the purpose of comparing bids, only. The specifications called for a sixty-inch monolithic reinforced concrete sewer 6,629 feet in length. Besides resting upon solid earth, the monolithic sewer was to rest upon curved concrete saddles, ten feet apart, each saddle to rest upon three piles. Several bids were received, and, that of plaintiff having been accepted, December 30, 1937, a contract was entered into between plaintiff and the city, calling for the construction of the sewer.

As the concrete which was to form the monolithic sewer was to be poured in place, it was, of course, necessary that the green concrete, while hardening, be kept dry. In order that prospective bidders might

have some information concerning the nature of the soil in which the sewer was to be laid, the city dug or drilled eleven test pits, most of which showed that the ground water level was higher than the top of the proposed sewer.

By the city's proposal, bidders were notified to examine the instructions thoroughly, together with the proposal, the form of contract, and the plans and specifications. In its bid or proposal, the contractor certified that it had personally and carefully examined the plans and specifications, form of contract, and instructions for the construction of the particular sewer bid upon.

Items Nos. 1 and 2 of the proposal cover the following:

| "Item No. | | | Unit Price | Amount |
|---|---|---|---|---|
| 1 | 6,629 Lin.Ft. | 60" Monolithic Reinforced Concrete Sewer, Incl.: 75—8" Sewer Inlets, at Twenty-nine Dollars and Thirty-one Cents per Lin.Ft. | 29.31 | 194,295.99 |
| 2 | 15 Lin.Ft. | 60" Monolithic Reinforced Concrete Sewer on Curves at Twenty-nine Dollars and Eighty-one Cents per Lin.Ft. | 29.81 | 447.15" |

The contract provided that the work should be done in all respects in accordance with plans on file, and in accordance with the standard plans and specifications of the city of Seattle, in so far as the latter should be applicable. The special specifications contained the following pertinent provisions:

"(6.0) TRENCHING FOR SEWER: . . .

"The City Engineer has excavated test pits in the locations shown on the plans and the ground conditions encountered are shown thereon for the contractor's information, and shall not be construed as a guarantee of similar conditions in excavating the trench.

"The contractor shall provide a method of draining the trenches that will secure a firm bottom foundation for constructing the sewer. If a satisfactory well-point drainage system is used and the drainage water does

not carry any appreciable quantity of earth, the contractor will be allowed to drain such water into existing sewers where such facilities are available. . . .

"Payment for trenching shall be included in the price bid for the sewer."

"(9.6) PLACING CONCRETE:

"Before any concrete is deposited, all water shall be removed from the excavation. The water level shall be kept below the green concrete for a period of at least twenty-four (24) hours after placing."

"(9.9) PAYMENT:

"Payment for 60″ Monolithic Reinforced Concrete Sewer will be made at the price bid per linear foot therefor, which shall be in full for all labor, materials and requirements necessary for the completed sewer, in accordance with the plans and specifications. Measurement will include the sewer under the three-foot manholes."

Claims for extras were provided for, no such claim to be recognized unless a memorandum of the work be signed by the contractor and approved by the city engineer.

In § 1 of the standard plans and specifications is found the following:

"The special specifications and detailed plans accompanying the proposal are intended to modify, and shall take precedence over the standard specifications and standard plans."

Section 127 of the standard plans and specifications reads as follows:

"In wet ground a subdrain shall be constructed when so directed by the city engineer, of sewer pipe of the size indicated, laid with open joints and surrounded with gravel. At proper intervals, the subdrain may be connected to the sewer if suitable provision is made to prevent sand and other material from running out and undermining the adjacent masonry. After the completion of the sewer the connections between the subdrain and the sewer shall be filled with concrete

or brick work, surfaced and finished, in the same manner as the sewer.

"Payment shall include all excavation, pipe, gravel, and other material, and shall be made at the price bid per linear foot. Measurement shall be made on the slope."

Nine bids for the work were submitted. The lowest bid, submitted by the plaintiff, was just under $250,000; the highest bid a little over $350,000.

It appears that the plaintiff anticipated that the trench in which the sewer was to be constructed could be kept dry by means of the use of well-points, a well-point consisting of perforated pipes surrounded by screens, these being driven into the ground, the water collects therein, and is pumped out.

The first work which plaintiff performed under the contract was the digging of a sump. In the course of the excavation for the sump, about four feet of clay was found, and as the presence of clay would render the well-point system of drainage unsatisfactory, other methods of drainage were considered. Seven or eight hundred feet of the sewer trench were excavated, and three hundred feet of subdrain were installed, beginning at the sump which had been constructed, in which a pump was installed to draw the water from the subdrain. The subdrain consisted of unjointed clay pipe placed below the grade of the trench. This method proved satisfactory, and the then city engineer prepared plans for such a drain. The plaintiff agreed to place the same, for a consideration of two dollars per linear foot, to be paid by the city. This agreement was made about April 8, 1938.

In May, 1938, the city engineer who had, up to that time, been in charge of the construction, was succeeded by C. L. Wartelle, who, after inspection and investigation, wrote the plaintiff a letter, which, after identify-

ing the work, and stating that the former engineer had authorized the construction of the subdrain and agreed to pay therefor, stated that payment under this agreement would be allowed for the work already performed (such payment being made in due time), continuing:

"However, you are hereby advised that, for the balance of the improvement, northerly from Sta. 78 plus 59 (in the vicinity of Fidalgo St.) *no* payment for this subdrain will be allowed; for the reason that the city engineer finds the specifications governing your contract fully impose all responsibility for the proper dewatering of the trench on the contractor.

"The city engineer has no criticism to make of the method so far employed by you in dewatering the trench. You are simply advised that *no* payment for subdrains or other means of dewatering the trench will be allowed on the work under your contract, except for that portion which has already been performed between Sta. 78 plus 59 and Michigan Street. Please be governed accordingly."

The plaintiff acknowledged receipt of this letter, stating its contention that it was entitled to receive payment for any subdrain which it should construct during the balance of the work.

The contract was fully performed by plaintiff, and the work accepted and paid for by the city. Later, the contractor filed its claim against the city for $8,686, being two dollars per linear foot for the amount of subdrain which it had constructed and for which it had not been paid. The claim was rejected, whereupon plaintiff instituted this action to recover judgment thereon. The cause was tried to the court sitting without a jury, and resulted in findings of fact, conclusions of law, and a judgment in plaintiff's favor, from which the city has appealed.

Error is assigned upon rulings of the trial court to

the effect that the agreement of the city engineer to pay for the subdrain was valid and enforceable against the city, and that Mr. Wartelle, the successor of the prior engineer, had no authority to countermand the agreement. Appellant also contends that the trial court erred in holding that the provision of the contract with regard to well-points was a representation or warranty as to ground conditions, and that there were misrepresentations as to these conditions. Finally, error is assigned upon entry of judgment in respondent's favor.

A very narrow issue is presented. Respondent frankly rests its case squarely upon the proposition that the city engineer was acting within the terms of the contract in, as respondent contends, "ordering respondent to install the subdrain," and that the city is bound by the agreement to pay respondent two dollars per linear foot for so much of that drain as respondent installed. Appellant contends that, by the contract, respondent was required to install and maintain such drainage as was necessary to keep the trench dry, and that the agreement which the city engineer entered into to pay for the subdrain was a mere gratuity, which the city had no right to make, and which the city could later repudiate.

Under the specifications, the main pipe, or "barrel," of the sewer was to rest directly upon the earth floor of the trench, being supported, or braced, at intervals by the concrete saddles and piling, above referred to. The concrete barrel was poured in place, and, of course, if the earth upon which it rested was wet, the green concrete would not dry properly, but would become porous due to withdrawal of the cement, and the job would be defective and unsatisfactory. It is evident that the city was not interested in any particular method of draining the trench, provided that the

method employed was effective and the earth kept dry to allow the green concrete to harden properly.

The standard specifications were made part of the contract, but in the first section thereof, it is stated that the special specifications take precedence over the standard. See quotation *supra.* It is important to note that the contract itself provides that the special provisions control, in so far as they differ from the standard. Respondent relies upon § 127 of the standard, above quoted, providing for the installation of a subdrain in wet ground, upon direction of the city engineer, and contends that, in the case at bar, such a drain was ordered as an extra, for which no price was provided in the contract, and that, therefore, respondent is entitled to recover herein upon the basis of the price of two dollars per linear foot, under the contract with the city engineer.

Section (6.0) of the special specifications, above quoted, after reciting the excavation by the city of test pits, and the purpose thereof, bound respondent to "provide a method of draining the trenches that will secure a firm bottom foundation for constructing the sewer." The section continues by stating that, if a satisfactory well-point trench system is used, etc., the water might be turned into existing sewers, the section concluding: "Payment for trenching should be included in the price bid for the sewer."

Section (9.6) specifically provides that, before any concrete is deposited, all water shall be removed from the excavation and kept away for at least twenty-four hours after the concrete is placed.

The subdrain which was installed was not a connected, continuous sewer, sections one and two thereof draining in opposite directions, and the third section draining in a different direction from the second. It appears that clay was found in practically all parts of

the trench, thereby rendering the well-point system of drainage impractical. Respondent's foreman testified that, without the aid of a pump, even the subdrain would not have kept the trench dry, while an officer of respondent testified, when asked if respondent did not buy well-points with the idea that they could be used, answered: "A. We never are sure. Q. You bought them, though? A. We never are sure what we are going to find underground."

Respondent concedes that, under the special specifications, it was respondent's duty to dewater the trench, and that the burden of performing this work rested upon the contractor. Respondent, nevertheless, contends that it is entitled to receive from the city extra compensation for the subdrain. In support of this contention, respondent calls attention to that portion of § (6.0), which provides that "payment for trenching shall be included in the price bid for the sewer."

■ As above stated, thirty-one unit bids were submitted, items Nos. 1 and 2 being above quoted. The question to be determined is whether the dewatering of the trench and the installation of the subdrain for that purpose constituted an extra, to be paid for as such, or whether this labor and material were included within the four corners of the contract. If the drainage of the trench was part of the contract as a whole, and included within the respondent's bid, whether or not the drain was part of the sewer is unimportant. Respondent contends that the provision in the specifications, that "payment for trenching shall be included in the price bid for the sewer," refers not merely to items Nos. 1 and 2, above quoted, covering only the sewer barrel, or pipe, but refers to the prices bid on the thirty-one items making up the completed job; and that the subdrain properly falls within item No. 11,

covering extra excavation, or item No. 7, providing for "gravel in place except in roadways."

Respondent contracted to construct the sewer, pursuant to the plans and specifications, for the contract price. Certainly, the digging of the main sewer trench was provided for in the contract, and the removal of water from the trench was a vitally important part of the construction of the sewer. Respondent admits that, under the contract, it was its duty to dewater the trench, and it evidently contemplated the accomplishment of this necessary end by the use of an appropriate number of well-points. This method, however, proved ineffective, because of the presence of large quantities of clay in the soil through which the trench was to be excavated. The test pits prepared by the city in advance of the letting of the contract showed the presence of much water, and that the ground level of the water was higher than the top of the proposed sewer. All bidders, therefore, were advised of the absolute necessity of the employment of some adequate means for the removal of the water. The contract referred to the excavation of these test pits, but contained the provision above quoted, to the effect that there was no guaranty of similar ground conditions being found in the trench to be excavated. Any person proposing to bid on the contract was at perfect liberty to make any further study that he desired concerning the nature of the ground through which the trench was to be dug.

The subdrain installed was useful only during the construction of the sewer. Evidently, it was left in place, because it was not practical to remove it, but it filled no further useful purpose.

We are convinced that, by the terms of the contract itself, respondent was obligated, as part of the work which he agreed to complete, to do everything which was accomplished by the subdrain.

As stated by respondent's officer, in bidding upon such a job as the sewer in question, a contractor is never sure what will be found underground. In the instant case, while certainly the presence of considerable water was to be anticipated, the exact quantity was not known, and in the absence of the digging of many test pits, the nature of the soil to be excavated would be extremely uncertain. Any of several soil conditions which would render the digging of the main trench difficult and more expensive than ordinary might have been encountered.

The considerable difference in the amounts of the bids indicates a difference of opinion among the bidders concerning the cost of the work called for by the plans and specifications. The presence of the large amount of clay which was encountered was certainly not an extremely unusual condition, or one beyond the bounds of anticipation. Respondent obligated itself to construct the sewer according to the plans, for an agreed price, and assumed the burden of meeting unexpected difficulties in the course of the work, as he would gain advantage if the work proved easier than was anticipated.

Some ground exists for the contention that the contract is ambiguous in one respect. Items Nos. 1 and 2 of the proposal, above quoted, call for unit price bids per linear foot on the sixty-inch concrete barrel. There were twenty-nine other items upon which bids were submitted, most of which covered matters entering into the actual construction of the sewer. Section (9.9), *supra*, calls for payment at the price bid per linear foot for the sewer, such payment to be in full for all labor, materials, and requirements necessary for the completed sewer, in accordance with the plans and specifications. This paragraph, if read literally, might be construed to limit respondent's compensation under the

contract only to the amount bid on items Nos. 1 and 2, *supra.* Such a construction, however, would be in direct contradiction to the entire contract. Section (9.6) of the same paragraph, *supra,* provides for the removal of all water from the excavation, etc. Section (9), of course, must be considered as a whole, and we are convinced that the payment called for by § (9.9), to be in full for the "completed sewer," includes respondent's compensation for removal of water, in order to enable the concrete barrel to be properly constructed.

Respondent attempts to differentiate between the dewatering of the trench and the furnishing of a proper foundation for the sewer barrel. By the use of pumps alone, the water in the trench was kept low enough so that all the required piling could be driven. It appears, however, that pumps were unable to keep the water low enough to furnish a dry earth foundation for the concrete barrel, as expressly required by the contract. Some additional method of drainage, supplementing the pumps, was necessary to render the bottom of the trench dry, so that the concrete could be properly placed in position and harden, unaffected by water.

If respondent was not entitled to additional compensation for the installation of the subdrain, but was required to itself pay for draining the trench, the agreement between respondent and the city engineer was without consideration, and unenforceable.

In 17 C. J. S. 465, § 112, the rule is stated as follows:

"The promise of a person to carry out a subsisting contract with the promisee or the performance of such contractual duty is clearly no consideration, as he is doing no more than he was already obliged to do, and hence has sustained no detriment, nor has the other party to the contract obtained any benefit. Thus, a promise to pay additional compensation for the performance by the promisee of a contract which the promisee is already under obligation to the promisor

to perform is without consideration, and this rule has been applied to building and construction contracts."

· In 3 Sutherland on Damages (4th ed.), 2652 *et seq.*, § 707, is found the following text:

"It is essential that the work which is claimed for an extra should be so; for if it was in truth covered by the contract there would be no ground for asking compensation for it beyond that provided therein; and a promise to pay for it would be without consideration, unless the refusal to proceed with the work was because of substantial and unforeseen difficulties in its performance which would cast an additional burden upon the contractor not anticipated when the contract was made. For all work done beyond the contract under prior direction or subsequent consent there is an undoubted liability."

The same rule is stated in the Restatement of the Law of Contracts, 83, § 76.

· The cases of *Lewis v. McReavy*, 7 Wash. 294, 34 Pac. 832, and *Keane v. Fidelity Sav. & Loan Ass'n*, 173 Wash. 199, 22 P. (2d) 59, recognize the doctrine, though in the latter case it was held that the rule was not applicable to the facts there presented.

■ Respondent cites authorities laying down the rule that a contractor may rely upon conditions expressly represented in the plans and specifications, and can recover if such conditions are misrepresented. These authorities are not in point, as it cannot be held that, by the terms of the contract, appellant city made any representations concerning conditions likely to be found in the course of the execution of the contract. The portion of the special specifications providing that, "if a satisfactory well-point system is used," etc., does not amount to a representation by the appellant that a well-point system would be effective or satisfactory. The reference to the excavated test pits clearly negatives any such construction of the contract. The con-

tract reference to the use of well-points simply gave the contractor the privilege of draining the water away through existing sewers, where available, under the condition specified. By the contract, the city expressly refused to guarantee ground conditions, which included the presence of water, of which it was known there was considerable.

Mr. Wartelle's letter cannot be construed as an order to continue the use of a subdrain; the letter simply stated that the engineer had no criticism of that method of drainage. Respondent was apparently left free to employ any effective means of drainage during the remainder of the work.

The trial court made lengthy findings of fact, finding, among other things, that the specifications contained a reference to the use of a satisfactory well-point drainage system

". . . and the drawings (exhibit 3) represented that the city engineer had caused test holes or borings to be dug or bored near the line of the proposed sewer trench, and that the soil to be encountered at the grade line of the sewer trench consisted only of sand, indicating that the contractor would be able to follow a well-point drainage system;"

further finding that respondent, acting upon the information set forth and disclosed in the specifications and upon the plans, supplied himself with well-points, etc.

Examination of exhibit 3, the blueprint plans of the work, which was introduced by respondent, discloses that the eleven test holes or borings, referred to in the specifications, are indicated thereon; that all eleven test holes indicate the presence of considerable water; and that eight of them show the presence of clay, or hard clay, sometimes in two strata, only three of the test holes showing only sand and water. Certainly, the exhibit referred to does not support the finding of the trial

court. There can be no question but that the test holes, as described on the blueprints, indicated the presence of a great deal of clay; and in view of the importance of that condition, as disclosed by the testimony, respondent was certainly put upon full notice concerning the conditions which he actually found in digging the trench.

We are of the opinion that the soil and water conditions found in the course of carrying out the work were within the reasonable anticipation of all parties concerned.

Appellant having nowise misled respondent as to underground conditions to be encountered in carrying out the contract, and considering the contract as a whole, it must be held that the burden of removing the water, and keeping the bottom of the trench dry and in such condition that the green concrete, when poured, would harden satisfactorily, rested upon respondent; and that respondent is not entitled to require that appellant pay the cost of installation of the subdrain, from and after the date when the city engineer notified respondent that the city would no longer be responsible for that item of expense.

We are not here concerned with any demand on the part of the city for the return of any of the money which appellant paid under the agreement of appellant's city engineer to pay for the installation of the subdrain. That would present an entirely different question, with which we are nowise concerned.

The judgment appealed from is reversed, with directions to the trial court to dismiss the action.

BLAKE, C. J., STEINERT, GERAGHTY, and JEFFERS, JJ., concur.