Enrique **MEDINA** Fernandez, Ginas Jiminez Nortes, Victor Rodriguez, Manuel Fernandez Rodriguez and Augustin Cabrera Oroza, Appellants,

v.

Charles C. **HARTMAN**, Rear Admiral and commandant of Eleventh U. S. Naval District, and Richard C. Hoy, district director, U. S. Immigration and Naturalization Service, Appellees.

No. 15657.

United States Court of Appeals
Ninth Circuit.

July 17, 1958.

See also 256 F.2d 512.

A. L. Wirin and Hugh R. Manes, Los Angeles, Cal., Francis Heisler, Carmel, Cal., for appellants.

Laughlin E. Waters, U. S. Atty., James R. Dooley, Asst. U. S. Atty., Los Angeles, Cal., for appellees.

Before FEE and CHAMBERS, Circuit Judges, and CHASE A. CLARK, District Judge.

570

CHAMBERS, Circuit Judge.

Five sailors of the Spanish Navy held by the Immigration Service at or near San Diego, California, resist this government's intentions to return them through the agency of the United States Navy to the Spanish Navy. All deserted during the month of June, 1957. At the time of desertion they were assigned to two Spanish destroyers, the Lapanto and the Almirante Ferrandiz. The ships were in the harbor at San Diego. While on shore leave, within the time limits thereof, the sailors, intending to desert, made their way to the border and crossed into Tijuana, Mexico. Among other things, they assert they are not ordinary deserters but political refugees.

Eventually they were apprehended in Baja California and brought by Mexican officials under the coaxing of American and Spanish navy officers to the border where all five crossed into the United States rather involuntarily. Once back in this country, the United States Navy took charge of the men. (Certain "paper work" transactions occurred at the border, to which reference will be made later herein.) The purpose of returning the men to Spain was frustrated at least temporarily by these habeas corpus proceedings.

The district court has ruled against petitioners on the ground that their return to the Spanish Navy is required by article XXIV of the Treaty (of 1902) between the United States and Spain of Friendship and General Relations, 33 Stat. 2117. The article says, in part:

"The Consuls-General, Consuls, Vice-Consuls and the Consular-Agents of the two countries may respectively cause to be arrested and sent on board or cause to be returned to their own country, such officers, seamen or other persons forming part of the crew of ships of war or merchant vessels of their Nation, who may have deserted in one of the ports of the other."

■ It is this court's conclusion that the treaty section [1] is inapplicable here because it is satisfied that the desertion of the sailors did not occur in an American port, but in Mexico. Within their times of leave, the men appear to have crossed into Mexico.

■ Desertion is a serious crime roughly equivalent to a serious non-military felony. Therefore, one must be particularly careful that the limits are circumscribed and not rubbery. Desertion requires an act and an intent.[2]

1. In defining desertion as used in a treaty, if there is no showing of what the Spanish definition of desertion has been or is now, one does not reach the question of which country's definition of desertion should be applied under the treaty. In the absence of a showing of the fact to be to the contrary, it is a familiar principle that the foreign law is presumed to be the same as the domestic. Also, in defining desertion as used in the treaty a question might arise as whether it should be defined as of 1902 or as of 1957, reflecting an intervening statutory change. But this court's opinion is that no modification in definition from the separate rules and statutes of the American Army and the American Navy in force in 1902, to (and after) the adoption of the Uniform Code of Military Justice in 1950 (64 Stat. 107) now 10 U.S. C.A. § 801 et seq. and the proclamation of the Manual for Courts Martial on February 8, 1951, by Executive Order 10,214, has been made which would af-

fect the result here by selecting one date or another.

Indeed, one may believe that except as modified by statute in various countries the definition of desertion has universally been: absent without leave with intent not to return to duty.

2. Not until the adoption of the Uniform Code of Military Justice, 64 Stat. 135, art. 85 (now see 70A Stat. 67, 641, 10 U.S.C.A. § 885) was there a comprehensive and explicit statutory definition of the offense of desertion. And even then one finds it amplified in the 1951 Manual for Courts Martial, United States, proclaimed by Executive order, by the President of the United States on February 8, 1951. See page 310 of the Manual.

However, both the laws for and the rules of the army and navy made it clear (as did the Uniform Code of 1950) there is a difference between a basic offense and an attempt. See Articles 77, 78, and 85 (c) of Uniform Code of Military Justice. Also, 1949 Manual for Courts Martial

There is no question of intent here. At all times, even prior to leaving the ship, the petitioners intended to desert. But this court believes that for the requisite act to occur the sailor must at least get to a place where he was not authorized to be by his commanding officer, or be at the originally authorized place after the time has expired. The thought that intent alone on desertion is enough should not be imported by judicial pronouncement or by the easy reasoning that the leave was obtained by fraud—therefore the leave was void and, ipso facto, the sailor had no right to be on leave. Further, there was no showing in the instant case that any representations were made by the sailors to the commanding officer.

There is little authority on the elements of desertion that is helpful here. This is probably because the usual instance or case of desertion involves intent as an issue rather than the act. Also, there is ordinarily no occasion to consider whether "out of time" and "out of place" must coincide, because usually time catches up with the place. And the cases are rare where the exact place of desertion has any importance. But the question bobs up here forcefully and one must resort to the statutes and general principles.[3]

---

U. S. Army, pp. 258, 259 and the official 1937, "Naval Courts and Boards," § 43, p. 14.

Absence without leave, the lesser and first ingredient of desertion, has been traditionally defined about as now found in Uniform Code in the following words:

Article 86

"Any member of the armed forces who, without proper authority—

"(1) fails to go to his appointed place of duty at the time prescribed; or

"(2) goes from that place; or

"(3) absents himself or remains absent from his unit, organization, or other place of duty at which he is required to be at the time prescribed;

shall be punished as a court-martial may direct."

Formerly, the Navy defined it as: 1. Absence from station and duty without leave, or (2) absence from station and duty after leave had expired. 1937 Naval Courts & Boards, § 74, p. 49.

If one has proper authority to be where one is, one is not absent without leave. See Avins, The Law of AWOL, and decisions therein collected.

3. Article 85 of the Uniform Code of Military Justice reads:

"(a) Any member of the armed forces of the United States who—

"(1) *without proper authority* goes or remains absent from [the] place of *service, organization, or place of duty* with intent to remain away therefrom permanently: or

"(2) quits his unit or organization or *place of duty* with intent to avoid hazardous duty or to shirk important service; or

"(3) ❋ ❋ ❋ is guilty of desertion.

"(b) ❋ ❋ ❋

"(c) ❋ ❋ ❋ ". (Emphasis supplied)

64 Stat. 135, 70A Stat. 67, 641.

One may see that this section adopted long after the Treaty of 1902 contains in the second subsection an amplification of the traditional concept of desertion. It should be pointed out that in the military concept one who is on leave within the limits or area and time of the leave is considered to be in his place of duty.

Respondents quote page 313, Manual for Courts Martial, 1951, as supporting their position. The quotation is as follows:

" ❋ ❋ ❋ When, without being regularly separated, a member of an armed force enlists or accepts an appointment in the same or another armed force without fully disclosing the fact that he has not been so regularly separated, *or attempts either such act* while in a duty status *or while on pass, liberty or leave*, he by that act *abandons his status* of duty, pass, liberty, or leave, and *from that moment becomes* absent without leave with respect to the former enlistment or appointment. Similarly, a member of the armed forces absent on a short pass or liberty from his organization who is found on board a ship at sea, without authority, *bound for a distant port*, may be regarded as having *abandoned any authority* he might have for his absence and to be absent without proper authority, *although he may not have gone beyond the area fixed in the pass and the pass may not have expired.*" [Emphasis added.]

This court finds no support for the respondents in the foregoing. The first sentence covers a conflicting enlistment. The second covers flight on a ship. Under familiar rules, the inclusion of one ordinarily excludes the other. Specifically here, the travel to the edge of the area limited by the leave granted would be excluded.

■ There are some problems of definition here. The treaty refers to "desert(ing) in one of the ports of the other." Then it was testified petitioners had "shore leave." The latter term is qualified as to area only by the statement of the petitioners that they had been forbidden by their orders to go to Mexico. Strictly the port would be the shore installation area of the harbor. But common sense precludes such a narrow construction. Not less must have been intended than to include within "port" the port city and its immediate environs, or at a large city, the metropolitan area. This court takes judicial notice that the 14 to 16 miles from downtown San Diego to the border would classify as within the environs of the City of San Diego, is within metropolitan Dan Diego.[4] Further, the exact limits of the shore leave of these petitioners not having been defined by the respondents in the pleadings or by evidence it must be assumed that it was not less than coextensive with the broad meaning herein given "port." Therefore, the "shore leave" extended to the Mexican border.

So in this analysis, petitioners did not attain the status of desertion until at least they had crossed the border. Then they exceeded the limits of space of their leave. But under the broadest concept they were no longer in an American port.[5] Therefore, the treaty is not applicable.

The respondents point to serious consequences of the preceding holding. It is said in effect, if intent and the beginning of an attempt are not enough, then within time of leave foreign military personnel can get far beyond a port, perhaps aboard transcontinental or foreign air flights. And the necessary act of getting beyond the area limits of leave will occur before the "deserter" will be caught. But this idea may reinforce the concept of this opinion. Maybe the treaty is out of date, needs to be renegotiated.

Look at the conditions in the United States in 1902. An intending deserter then could have no hope of escaping by automobile or plane. A Spanish sailor's feet alone, or a horse, offered little hope of getting away from the port without apprehension before sailing time. Trains have not had the flexibility needed for flight. So, hiding (usually with friends) in the port city was the standard method of accomplishing desertion pending the departure of the ship. In that context, one can understand the selection of the words for the Treaty of 1902.

■ In view of the holding that there was no desertion in an American port the U. S. Navy has no right to hold, no right to surrender respondents to the Spanish Navy as deserters.

Counsel for petitioners has made the case especially difficult for the court by seeking to put the Franco regime on trial here. But that regime is the government recognized by the United States and this government should observe its treaties with Spain. Without deciding, the court is inclined to the belief that if the desertion had occurred in the American port the Navy should be permitted to return petitioners to the Spanish Navy.

The question remaining is what disposition should be made of petitioners. The order will be that the respondent Hartman has no right to hold the petitioners and no right to turn them over to the Spanish Navy. He shall not do so. As to the respondent director, Richard C. Hoy, the order will be that the petitioners be returned to Mexico. This, however, will not preclude his permitting them to go voluntarily if they will do so.

Several factors enter into this matter of return to Mexico. It now appears that the government of Mexico has re-

---

4. In fact, much of the area between the San Diego harbor and Tijuana is in the city of San Diego. And the petitioners actually crossed from the city of San Diego into Tijuana.

5. No problem of an offense would be presented between a sailor and his own country. The law of attempts surely would catch the sailors vis-a-vis their own country. But the Treaty of 1902 in the pertinent section does not mention attempts.

versed the position earlier taken concerning the petitioners by its officers in Baja California. Presently it agrees to receive them. This is the place where petitioners wanted to go and this court sees no impediment. As this court examines the papers on which the petitioners were brought back across the American Border they just didn't fit the petitioners. While a stock form of "Order of Parole" was used, it no more fits the facts than a horseshoe fits the cloven hoof of an ox. Seemingly, at the border it was thought there must be some papers, so an order of parole was used, with some typewritten insertions to the effect that the petitioners were admitted and paroled into the United States for presentation to Spanish authorities. It would appear that the sailors now sit at the border without any real right to be there. Immigration at the time of the recrossing could have told them to go back to Mexico and it would seem it could and should do so now.

Neither the Spanish government nor any official thereof is a party here. No suggestion has entered the record that the petitioners should go in the course of an ordinary deportation to Spain.[5] Therefore, the case has been considered as that of five individuals crossing into the United States from Mexico, standing just inside the line, and whom we find without right to do so. When they go back to Mexico, where they fled, the question of their right to remain there will be no concern of the courts of the United States or of its executive branch.

Our conclusions herein are fortified by our examination of the opinions in Leng May Ma v. Barber, 357 U.S. 185, 78 S.Ct. 1072, 2 L.Ed.2d 1246, and Rogers v. Quan, 357 U.S. 193, 78 S.Ct. 1076, 2 L. Ed.2d 1252. There aliens were permitted to come within the United States and be paroled at liberty pending determination of their right to enter. These decisions confirm the long standing rule that no status of entry or other right to remain attain before the right to enter has been determined. While the crossing over in this, the sailors' case, was on the parole form of the Immigration Service, the parole is a sham. The petitioners have never been paroled in or into the United States. The form itself negatives any claim of coming in to have their right to enter determined, and the time limit of ten days has long since expired. They are held by United States authorities in this country. Certainly petitioners stand on a poorer footing than Leng May Ma and Quan.

Reversed for proceedings consistent with this opinion.

JAMES ALGER FEE, Circuit Judge (concurring).

A few words should be added to explain my position of special concurrence.

If these sailors had been apprehended in the United States after desertion, they would have been returned to Spain under the Treaty. If the immigration authorities held possession in virtue of a legal parole document, they can be required to return these sailors to Mexico, since the time limitation of ten days has expired. 8 U.S.C.A. § 1182(d) (5). If this so-called parole were void, these men entered this country illegally and presently

---

5. One finds puzzling the categorical statement in the original petition for habeas corpus, verified by oaths of counsel: "Thereupon [the five sailors] left said vessel for the purpose of remaining permanently in the United States because they understood it to be a free country, and hospitable to political refugees * * *." The statement is not in the frame of information and belief. Yet at the hearing the petitioners swore positively they had the intention before they left the boat and at all times thereafter to seek their haven in Mexico.

Additionally argument is made that because the return to the United States was really involuntary then conceptually the sailors just are not in this country. To complete the circle for the petitioners, saved from return to Spain by this decision, all that is needed will be here if the contention is then made in petitioner's behalf that the Immigration Service has no right to send them to Mexico—but this country must keep them.

**574**

have no recognized right to remain here. If an order to return petitioners to Mexico is not the proper judgment in a strict habeas corpus proceeding, still under 5 U.S.C.A. §§ 1009(b), (e) (A), review of the acts of the agents may be had therein in such a proceeding and appropriate order directing return to the border in custody may be validly issued.