327 F.2d 581
 SAN RAFAEL COMPANIA NAVIERA, S.A., and Orion Shipping & Trading Co., Inc., Appellants,
v.
AMERICAN SMELTING & REFINING COMPANY, Appellee.
AMERICAN SMELTING & REFINING COMPANY, Appellant,
v.
SAN RAFAEL COMPANIA NAVIERA, S.A., and Orion Shipping & Trading Co., Inc., Appellees.
 No. 18367.
 United States Court of Appeals Ninth Circuit.
 January 31, 1964.
 
 Wallace, Garrison, Norton & Ray, and Maynard Garrison, Jr., San Francisco, Cal., for appellant Financiera Peruana, S.A.
 McCutchen, Doyle, Brown, Trautman & Enersen, Russell A. Mackey, and Bryant K. Zimmerman, San Francisco, Cal., for appellant-appellees San Rafael Compania Naviera, S.A. and Orion Shipping & Trading Co., Inc.
 Bigham, Englar, Jones & Houston, New York City, and Lerer & Moltzen, San Francisco, Cal., J. Bond Smith, Jr., New York City, and Allan R. Moltzen, San Francisco, Cal., for appellees-appellants American Smelting and Refining Co. et al.
 Lillick, Geary, Wheat, Adams & Charles, and James L. Adams, San Francisco, Cal., and Nichols & Rogers, and Alan H. Nichols, San Francisco, Cal., for appellee Schirmer Stevedoring Co.
 Before MERRILL and DUNIWAY, Circuit Judges, and TAYLOR, District Judge.
 DUNIWAY, Circuit Judge.
 
 
 1
 This is the second case that has come before us arising out of the financial difficulties of a Peruvian firm entitled Naviera Andes Peruana (Navandes). (See Schirmer Stevedoring Co. v. Seaboard Stevedoring Corp., 9 Cir., 1962, 306 F.2d 188) The appeals in this matter are from a judgment rendered in an interpleader action brought by American Smelting & Refining Company (Asarco). As the interpleading party, it deposited in court moneys owing by it as freights for shipping cargo on the vessel OCEAN ALICE, which had been chartered to Navandes. Navandes had contracted to carry cargoes of ore for Asarco from South America to Asarco's plants at Selby on San Francisco Bay and at Tacoma, Washington. In its judgment the court determined that Asarco had deposited in cash the sum of $46,652.01, and that the total sum of the freight moneys due is $92,016.19, the difference being represented by a bond. The decision of the trial court is reported as American Smelt. & Refin. Co. v. Naviera Andes Peruana, S.A., at 208 F.Supp. 164.
 
 
 2
 It is undisputed that Navandes was bankrupt by June 8, 1959, and various of its creditors laid claim to the freights owing to it by Asarco. One of these creditors, Schirmer Stevedoring Company, Ltd. (Schirmer), had brought an action in the Northern District of California and levied an attachment on June 5, 1959. The district court authorized Asarco to deduct from the total freights the sum of $25,167.22 that it had paid to Schirmer for stevedoring services performed on the voyage of the OCEAN ALICE in connection with which the freights here in question were earned. The court found that on June 5, when the vessel arrived in San Francisco Bay, Navandes was bankrupt and therefore failed to provide, as it was required to do, for stevedoring services for unloading the vessel. Asarco then hired Schirmer, which unloaded the ship at a cost of $25,167.22, which Asarco paid. No contention is now made by any party that the court's allowance of this amount for the benefit of Asarco was erroneous. The district court held that Schirmer had priority against the net funds, subject only to the maritime lien of the owners of the OCEAN ALICE, Ocean Liberties, Inc., (Ocean). It therefore awarded to Ocean $15,005.61, moneys due for port charges and the charter fee due on June 20, 1959 on the OCEAN ALICE. Next it awarded Schirmer $41,561.72 for stevedoring services performed on other voyages under charter to Navandes. The award was made to Schirmer as first attaching creditor. Finally, the court awarded to San Rafael Compania Naviera, S.A. (San Rafael) and Orion Shipping & Trading Company, Inc. (Orion), owners of two other ships chartered in the same service, as second attaching creditors, the remaining $10,281.64. One other party, Financiera Peruana S.A. (Financiera), laid claim to these freights. It claimed to be the assignee of all of the freights, but the court awarded it nothing.
 
 
 3
 There are three appeals. Financiera appeals, claiming that it takes precedence over subsequent attaching creditors and over the owners' claim for charter hire that became due subsequent to the payment date of earned freights. Asarco appeals claiming that it is entitled to deduct certain expenses arising out of a strike at its Tacoma, Washington plant, and that the court erred in denying it certain counsel fees and costs. San Rafael and Orion appeal, claiming that their rights are prior to Schirmer's rights. All parties join in opposing the appeal of Financiera.
 
 
 4
 We consider first the appeal of Financiera. It says that it is a financial institution of Lima, Peru, engaged in buying at a discount freights to be earned on voyages up the west coast of North and South America, and that it agreed with Navandes to purchase the freights earned by vessels under charter to Navandes, which freights would become due and payable upon the arrival of these vessels at their ports of destination. It says that the consideration given by it was its payment of necessary stevedoring, fuel, port, charter, and other costs necessary and incidental to the voyages. It says that on April 6, 1959 a general document of intent as to four vessels, including the OCEAN ALICE, was executed, and that on April 24, 1959, shortly before the OCEAN ALICE sailed on her second voyage, the voyage giving rise to the freights deposited by Asarco, a specific assignment of the freights of that voyage was executed to Financiera by Navandes. One week before that date Navandes had advised Asarco that it irrevocably authorized Asarco to pay the freights of the voyage to Chase Manhattan Bank for Financiera. The OCEAN ALICE arrived in San Francisco on June 5, 1959 and tied up at Asarco's Selby plant on June 11, on which date, says Financiera, the freights became payable. Financiera also claims that it paid, during the progress of the voyage, various expenses totalling $59,382.
 
 
 5
 The trial court found that the assignment of April 24 was executed by the president and general manager of Navandes, that on April 17 Navandes did authorize payment of the freights to Chase Manhattan Bank for Financiera, that on April 21 Asarco agreed to pay the freights for the benefit of Financiera, but that neither Navandes nor Financiera ever informed Asarco of the assignment.
 
 
 6
 The court also found that Financiera had failed in its burden of showing a valid assignment, stating: "The record is unclear as to exactly what the dealings were between Financiera and Navandes in general and in particular it appears no adequate consideration was given for the assignment of April 24, 1959 by Financiera." (208 F.Supp. at 169-170) The court was also of the view that the assignment falls within the Uniform Fraudulent Conveyance Act, because it rendered Navandes insolvent and was made without fair consideration. See Cal.Civ.Code, §§ 3439 et seq., 3439.04 and New York Debtor and Creditor Law, McKinney's Consol. Laws, c. 12, §§ 270 and 273. The court, however, did not rest its judgment on this ground, nor do we. In essence, the court's judgment as to the claim of Financiera is a little like the old Scots verdict of "not proved."
 
 
 7
 The record, as presented by Financiera, is most unsatisfactory. There was no proof of the delivery of the assignment, and no proof that the officers of Navandes who signed the assignment had any authority to do so. Neither the April 6 document nor that of April 24 contains any promise by Financiera to do anything. Also, although Financiera claims that it advanced in excess of $59,000 for this voyage, the record does not compel any such conclusion. Most of the items to which it refers were actually charged to other accounts, and some were not, on their face, for the benefit of the OCEAN ALICE. Also, many of the payments were made before the date of the assignment. The record also indicates that Financiera has been more than amply repaid, by the collection of freights of other voyages, for the total payments made by it to or for the benefit of Navandes. We note, too, that the pre-trial order recites that "Financiera contends that it made no loans or advances to Navandes and claims no indebtedness or right to repayment from Navandes on account of any amounts paid to Navandes or to others." It thus asserts rights solely as an assignee. We are not surprised that the court was unwilling to sustain its claims in the absence of compelling proof of their validity. We think that these and other facts support the court's finding.
 
 
 8
 Financiera also asserts a maritime lien under 46 U.S.C. § 971, but here again, for the reasons that we have already stated, we think that its proof is inadequate. We conclude that the judgment, insofar as it denies relief to Financiera, is correct.
 
 
 9
 We next consider the appeal of Asarco. Its first contention is that it is entitled to deduct from the freights certain expenses which it says that it paid, and that Navandes agreed to assume, in connection with three voyages between Peru and Asarco's Tacoma plant. One of these was a previous voyage by the OCEAN ALICE, which arrived at Tacoma on March 17, 1959; another was by the ARETI S., which arrived at Tacoma on May 15, 1959, and the third was a voyage by the ANDROS LEGEND, which arrived at Tacoma on May 13, 1959. At the time that each of these vessels arrived, Asarco's Tacoma plant was shut down by a strike, and had been since March 13. This prevented discharging the vessels at that plant and Asarco made arrangements for discharge at other locations. It claims that Navandes, through its agents, and by exchanges of cables, letters and telex messages, agreed to these alternate arrangements and to pay the additional costs to Asarco that arose from its acceptance of the cargoes at ports or places other than its Tacoma smelter dock.
 
 
 10
 The OCEAN ALICE discharged at Shaffer Terminal and there were additional costs, including a service charge, dockage, car loading, customs brokage, wharfage and rail freight, including shipping a certain part of the cargo to East Helena, Montana. Similar charges are claimed in connection with the ARETI S. In connection with the ANDROS LEGEND, Asarco claims that because cargo could not be discharged at Tacoma, it cancelled a tentative booking of cargo on this vessel, but reinstated it on request of Navandes, the vessel proceeding to Longview, Washington, where it discharged, and certain similar charges were incurred. These included a storage charge, stockpiling and reloading expenses, storage insurance, the expense of travel of an Asarco supervisor to Longview, and rail freight from Longview to Tacoma.
 
 
 11
 The trial court's findings and conclusions on this issue are as follows (208 F.Supp. at 167-169):
 
 
 12
 "On March 13, 1959, plaintiff's Tacoma plant was shut down because of a strike which prevented the discharge of vessels at Tacoma. As the duration of the strike could not be predicted, plaintiff made arrangements for alternate discharge of the Tacoma cargoes. Coincidentally with this, plaintiff cabled Navandes on March 26, 1959 suggesting the Force Majeur clause of the contract of afreightment include events not only at the port of loading but at the port of discharge as well. On March 30, 1959, Navandes cabled plaintiff saying, `Re contract of afreightment, we agree changes your cable 26'.
 
 
 13
 * * * * * *
 
 
 14
 "Since plaintiff, as consignee, was obligated to take delivery of the cargo, any extra expense resulting from its own failure to do so would be for its own account, unless there was a valid agreement to the contrary.
 
 
 15
 * * * * *
 
 
 16
 "Therefore, it becomes necessary to determine, concerning the first three voyages, whether or not the cables of March 23, 26 and 30, 1959 effectively modified the Force Majeur clause of the contract between Navandes and plaintiff to include strikes not only at the port of loading but at the port of discharge as well. In these cables, plaintiff suggested, because of the strike at its Tacoma smelting plant, that Navandes bear the extra cost incurred because unloading was impossible at Tacoma.
 
 
 17
 * * * * *
 
 
 18
 "The first voyage of the OCEAN ALICE arrived at Tacoma on March 17 and on March 23, Navandes agreed to bear the extra expenses of unloading her at Shaffer. But Navandes had earned its freight money upon loading the OCEAN ALICE days before, even though the money due was not payable until discharge. Plaintiff had promised nothing, nor had it given anything in exchange for Navandes' new promise to bear the extra expenses. Plaintiff had a preexisting duty to take delivery at Tacoma and bear the amount due upon delivery. It has given no new consideration for Navendes' new promise. The same theory is applicable to the sailings of the ARETI S. and the ANDROS LEGEND. These sailings had already been booked when on March 23, Navandes agreed to absorb the extra costs plaintiff required. Not only was there no consideration given for Navandes' new promise, but it was, as its wire of March 23 shows, already in financial straights [sic]. Navandes was in no position to bargain effectively against the threat of cancellation of these voyages. For these reasons, the Court finds there was not a valid modification of the contract and plaintiff is not entitled to deduct the extra expenses incurred by it because of the strike."
 
 
 19
 It is interesting to note that, while now claiming $24,157.85 as the amount owing to it, Asarco paid freights for the first voyage of OCEAN ALICE in the sum of $137,702.76, for that of the ARETI S. in the sum of $98,116.48, and for that of the ANDROS LEGEND of $23,268.03, without offset or deduction of the extra charges.
 
 
 20
 We think that the court was correct in holding that Navandes' promise to pay these charges was without consideration. But Asarco asserts that the contract of afreightment is governed, by its express terms, by the law of the United States, that in this case that provision means the law of New York, and that under New York law, a new consideration for Navandes' promises was not required.
 
 
 21
 The Personal Property Law of New York, McKinney's Consol. Laws, c. 41, Section 33(2), provides:
 
 
 22
 "An agreement * * * to change or modify * * * any contract * * * shall not be invalid because of the absence of consideration, provided that the agreement changing, modifying * * * such contract * * * shall be in writing and signed by the party against whom it is sought to enforce the change, modification * * * or by his agent."
 
 
 23
 Asarco says that this statute applies because New York is the locus contractus. This is based upon the fact that some of the negotiations were carried on between Navandes' New York agents, Boyd, Weir and Sewell, and Asarco's New York office, and that the cables of March 26 and 30, referred to in the court's findings were between Navandes, Lima, and Asarco, New York. It is doubtful, however, whether New York was the locus contractus. The telex messages, including Navandes' cable of March 23, were between Navandes and its New York agents, and, so far as appears, were not signed. In this respect, they can perhaps best be described as written conversations. Navandes' cable of March 30 was signed. It was sent in Peru, and, assuming that it effectuated a contract, would appear to make Peru the locus contractus. (Restatement, Conflict of Laws, § 326(b), comment (b)).
 
 
 24
 Moreover, even if New York is the locus, we can see no sound reason for applying its law here. The contract dealt entirely with shipments between Peru and California and Washington. New York's "interest" in the contract is minimal, if any. Peru, California, Washington and the high seas are the places of performance. The negotiations dealt entirely with performance in the State of Washington. The affected contract also dealt with performance in California. The forum is California.
 
 
 25
 If we look to the lex loci contractus, that of Peru (see Restatement, Conflict of Laws, § 332 and especially subdivision (c)), we are met with the fact that nobody made any attempt to show what that law may be. Under these circumstances, it is presumed to be the same as the law of the forum, i. e., California. (See Nesbit v. MacDonald, 1928, 203 Cal. 219, 263 P. 1007; People v. Spitzer, 1922, 57 Cal.App. 593, 208 P. 181; Medina v. Hartman, 9 Cir., 1958, 260 F.2d 569).
 
 
 26
 If we apply what are called modern concepts in the conflict of laws, and look to the jurisdiction having a substantial interest in relation to the contract, we should apply either California or Washington law. It is also suggested that we should not apply the law of any state, but general maritime law.
 
 
 27
 We think it unnecessary for us to say whether we are applying California law, Washington law, or general maritime law. Whichever be applied, the result is the same. It is clear, and the court found, (a) that but for the purported modification, the extra charges would be for Asarco's account, not that of Navandes, (b) that Navandes received no consideration for its promise to pay them, and (c) that, at the time Navandes was in no position to bargain effectively. Under these circumstances, Navandes' promise is not enforceable (a) under Washington law (Queen City Const. Co. v. Seattle, 1940, 3 Wash.2d 6, 99 P.2d 407), (b) under California law (Main Street & A. P. R. Co. v. Los Angeles Traction Co., 1900, 129 Cal. 301, 61 P. 937; Berkowitz v. Tyderko, Ltd., 1936, 13 Cal.App.2d 561, 57 P.2d 173), (c) under general maritime law (Alaska Packers' Ass'n v. Domenico, 9 Cir., 1902, 117 F. 99).
 
 
 28
 Asarco asked the court to award it $12,500 as counsel fees. As to this, the trial court held (208 F.Supp. at 171-172):
 
 
 29
 "The granting of plaintiff's prayer for attorney's fees is within the discretion of the court and may properly be denied when the plaintiff has some interest in the outcome of the case. Century Insurance Co. v. First National Bank (5th Cir. 1939), 102 F.2d 726. At bar there is a contest between plaintiff and the interpleaded parties not only to the amount of the fund but to the interest plaintiff may have in the fund as well. For these reasons the Court feels plaintiff is not entitled to attorney's fees."
 
 
 30
 The court did not abuse its discretion. See Schirmer Stevedoring Co., Ltd. v. Seaboard Stevedoring Corp., supra, on which Asarco relies. In that decision we recognized that the court has a discretion to grant or deny fees, our holding being that it cannot grant fees incurred in asserting an interest in the deposited funds on behalf of the interpleading party. We did not hold that the court must grant any fees to such party, but only that it may do so. (See particularly pp. 193-195 of 306 F.2d).
 
 
 31
 Asarco also asked for its costs of publishing the summons, restraining order, and notice. The action was begun in the Southern District of New York. Asarco then asked for, and obtained, an ex parte order for publication, upon its representation that Novandes, San Rafael, Ocean and Financiera could not be served within the district or the territorial limits of the United States, relying on sections 232 and 232-a of the New York Civil Practice Act, or 28 U.S.C. § 1655. The order, as originally signed, directed publication of summons, complaint, temporary restraining order and order to show cause for six consecutive weeks, in both the New York Times and the New York Herald Tribune. This would have cost over $12,000. Asarco then obtained a new order that omitted the requirement of publication of the complaint. The actual cost of publication so ordered was $2,562.66. We adopt the views of the district judge as follows (208 F.Supp. at 172):
 
 
 32
 "Plaintiff's reliance on Republic of China v. American Express (S.D. N.Y.1952) 108 F.Supp. 169 to support its prayer for costs of service by publication within Section 1655 of Title 28 U.S.C. is in error. If Section 1655 is applicable at all in this proceeding, and there is some doubt in the Court's mind whether or not it is, it would appear that A/S Krediit Pank v. Chase Manhattan Bank (S.D.N.Y.1957) 155 F. Supp. 30 is apropos. It found Section 1655 allows service by publication only where `personal service is not practicable.' Mere absence from the district, even from the country is not enough to show personal service is not practical where personal service on the defendant named in the publication by plaintiff could have been easily accomplished. It could have been here as both these party defendants had agents well known to plaintiff. For that reason plaintiff's request for publication fees is denied."
 
 
 33
 We add that section 1655 requires that service be "on the absent defendant personally if practicable, wherever found." This is not limited to the district in which the action is filed, or even to the territorial limits of the United States. Non constat that such service could not have been made in Peru.
 
 
 34
 It is even more doubtful whether sections 232 and 232-a of the New York Civil Practice Act apply. But if they do, they do not help Asarco. Section 233 expressly provides: "In all cases when publication of the summons is ordered, service of the copy of the summons and complaint * * * by the delivery thereof to the defendant personally without the state is equivalent to notice by publication * * *." (3A Gilbert-Bliss, Civil Practice of New York, Annotated, Recompiled, § 233) There was no showing that such service could not be made. We think that, absent such a showing, Asarco should not be allowed the cost of an expensive and, so far as appears, unnecessary publication.
 
 
 35
 Finally, we consider the appeals of San Rafael and Orion. They attack the validity of Schirmer's attachment. They, too, are attaching creditors. Schirmer's attachment, in an action filed in the Northern District of California, was levied on June 5; San Rafael's and Orion's, in actions in the Southern District of New York, were levied on June 8.
 
 
 36
 On this subject, the trial court's findings and conclusions appear at 208 F. Supp. 171.
 
 
 37
 It is claimed that the attachment was invalid because there is no evidence that Navandes could not be found within the Northern District of California on June 5. The court rejected this argument on the ground that the writ directed the Marshal to attach if Navandes could not be found, and the Marshal is presumed to have done his duty, citing 7 C.J.S. Attachment § 252. We think that the record affirmatively shows that the Marshal did his duty. Two forms of process were issued on June 5 — one a citation, and the other a writ of foreign attachment. On the citation, the Marshal has endorsed "that after due search and inquiry I was unable to locate [Navandes] * * * within the Northern District of California." He returned the citation on June 12. To the attachment, the Marshal attached a return stating service upon Asarco at 9:00 P.M. on June 5th. We think that, taken together, these returns show that Navandes could not be found on June 5 or thereafter. It would be hyper-technical to construe the return on the citation as meaning only that Navandes could not be found on June 12. A fairer construction is that it could not be found at any time up to June 12. As the trial court said, appellants have not proved the contrary to be true. We do not hold that the initial burden of showing that the principal defendant cannot be found within the district is not upon the party seeking foreign attachment. We only hold that here a prima facie case is made by the Marshal's returns, and that the burden then shifted to appellant. We leave to another time the question as to whether the attaching party has the burden of proof when, as here, the attack upon the attachment is not by the party attached, but by third persons. Here, assuming that Schirmer had the burden, it has made a prima facie showing.
 
 
 38
 Appellants also attack the validity of Rule 1(b), Rules of the Northern District of California, Admiralty, West's Ann.Code, which provides, as to foreign attachment "* * * [s]ervice shall be made upon the garnishee in the manner prescribed for service of process by Rule 4(d), Federal Rules of Civil Procedure." Service was upon C. T. Corporation, the agent for service of process designated by Asarco as a foreign corporation doing business in California, pursuant to California law. (Cal.Code Civ.Proc. §§ 542-546).
 
 
 39
 Appellants say, first, that service of attachment or garnishment issued by a California court, in the manner in which this service was made, would be invalid under California law. Schirmer does not disagree. (Cal.Code Civ.Proc. §§ 542-546, 557). They say, next, that it would not be valid in an ordinary civil action in a Federal District Court in California. (Rule 64, F.R.Civ.Proc.) Again Schirmer does not disagree. These contentions, however, seem to us irrelevant. Foreign attachment in Admiralty is not governed by state law but by the Federal Admiralty Rules approved by the Supreme Court and the rules of the Federal District Courts. The procedure is an ancient one in the Admiralty courts. (See Kingston Dry Dock Co. v. Lake Champlain Trans. Co., 2 Cir., 1929, 31 F.2d 265; Bjolstad v. Pacific Coast S.S. Co., N.D.Cal.1914, 221 F. 692).
 
 
 40
 The real questions presented are two — does local Admiralty Rule 1(b) authorize such a service, and, if so, is it valid? The answer to the first question seems to us to be so plainly "yes" as not to require discussion. The second question presents more difficulty. Admiralty Rule 44 authorizes the District Courts "to regulate their practice in such a manner as they deem most expedient for the due administration of justice, provided the same are not inconsistent with these rules." Appellants say that this does not authorize local Rule 1(b). They rely upon Miner v. Atlass, 1960, 363 U.S. 641, 80 S.Ct. 1300, 4 L.Ed.2d 1462. We think that decision not applicable. It dealt with an attempt to make applicable to suits in admiralty by local rule the discovery practice as provided for by the Federal Rules of Civil Procedure. It held that this could not be done. Only a part of the discovery rules were included in the Admiralty Rules; the others were deliberately omitted, and hence not within the authority conferred by Rule 44, since admiralty courts have no inherent power to grant discovery.
 
 
 41
 Foreign attachment, on the other hand, is "old process" in admiralty and is recognized in Admiralty Rule 2. The Admiralty Rules, however, do not provide for a mode of service. Such a provision, by local rule, seems to us clearly authorized by Admiralty Rule 44.
 
 
 42
 Nor can we find local rule 1(b) invalid on grounds of due process. The writ of foreign attachment directs the Marshal to attach moneys due to Navandes in the hands of Asarco, and to cite and admonish Asarco to appear. It is, as appellants assert, a means of obtaining jurisdiction — of Navandes, by attaching its property, and of Asarco by citing it to appear. It thus partakes, in part, of the nature of a summons in a civil action. The method of service was the same as that of serving a summons. It effectively gave actual notice to Asarco, whose agent promptly notified it. Under these circumstances, we can find no lack of due process. (See National Equipment Rental, Ltd. v. Szukhent, 375 U.S. 311, 84 S.Ct. 411, 11 L.Ed. 2d 354 (1964).
 
 
 43
 Wuchter v. Pizzutti, 1928, 276 U.S. 13, 48 S.Ct. 259, 72 L.Ed. 446, on which appellants also rely, is not controlling. It dealt with service of process on the Secretary of State of New Jersey under that state's non-resident motorist statute. There, the "appointment" of the Secretary as the motorist's agent was fictional, so far as the motorist was concerned. The "appointment" was by the statute. No notice by the Secretary to the motorist was required, and this was held to deny him due process. Here, the law required the designation by Asarco of an agent. But it is no fiction that Asarco did the designating. Under these circumstances, it does not deprive Asarco of due process to assume that the agent will promptly notify Asarco of the service of any process received, even though the statute does not expressly require that he do so, and even though the particular process may not be the type of process that Asarco and the agent may have had in mind when the agent was appointed. (See Mississippi Pub. Corp. v. Murphree, 1946, 326 U.S. 438 at 442-444, 66 S.Ct. 242, at 244-246, 90 L.Ed. 185.)
 
 
 44
 The judgment is in all respects affirmed.