**MASSACHUSETTS MUTUAL LIFE IN-
SURANCE COMPANY**

v.

**CENTRAL PENN NATIONAL
BANK et al.**

Civ. A. No. 43188.

United States District Court,
E. D. Pennsylvania.

Feb. 12, 1974.

William J. Kennedy, Philadelphia, Pa., for Massachusetts Mutual Life Ins. Co.

Richard M. Shusterman, Philadelphia, Pa., for Central Penn National Bank.

Harry A. Dower, Allentown, Pa., for Industrial Valley Bank.

Peter C. Paul, Philadelphia, Pa., for Mercantile Financial Corp.

Raymond T. Cullen, Jr., Philadelphia, Pa., for Federation Bank and Trust Co. (now Franklin Bank).

Stanley Schlesinger, Philadelphia, Pa., for Marine Midland Grace Trust Co. (MacNair Assignee).

Morris M. Shuster, Philadelphia, Pa., for Isadore Mokrin and Dorothy Mokrin.

Lester H. Novack, Philadelphia, Pa., for Gordon S. Miller.

SUR PLEADINGS AND PROOF

LUONGO, District Judge.

Massachusetts Mutual Life Insurance Company (Mass. Mutual) filed this interpleader proceeding on July 24, 1967 after a number of claims and attachments had been asserted against it for moneys due and to become due from Mass. Mutual to one Gordon S. Miller (Miller) under a General Agency contract. Upon the filing of the interpleader, Mass. Mutual paid into the registry of the Court all sums it claimed were then due and payable to Miller under the contract.

At an earlier stage of this proceeding, certain questions of law were resolved by Judge (now Senior Judge) C. William Kraft, Jr., acting pursuant to Rule 56(d), F.R.Civ.P. He ruled that wages, commissions and salaries are assignable under Pennsylvania law; that joinder of a wife in such an assignment is not necessary; that attachments made in Massachusetts under Massachusetts law are valid (with an exemption of $50 for wages) and are enforceable under Pennsylvania law. He ruled further, and ordered, inter alia, (Paragraph 4 of Order dated June 30, 1969, Document No. 122) 300 F.Supp. 1217, 1220:

"4. The exact status of Miller [whether employee or independent contractor] under his contract with Massachusetts Mutual is a material question of fact which requires a trial."

I have regarded those rulings by Judge Kraft as the law of the case and have applied them accordingly. Messinger v. Anderson, 225 U.S. 436, 32 S.Ct. 739, 56 L.Ed. 1152 (1912); Antonioli v. Lehigh Coal & Nav. Co., 451 F.2d 1171 (3d Cir. 1971), cert. denied, 406 U.S. 906, 92 S. Ct. 1608, 31 L.Ed.2d 816 (1972).

Throughout these proceedings there has been a dispute over whether Mass. Mutual has paid the full amount of the fund into court as required under 28 U. S.C. § 1335. The dispute stems from a provision in the contract between Mass.

Mutual and Miller which provides for reduction in the rates of renewal commissions payable to Miller upon termination of his General Agency contract for any reason other than Miller's death. Mass. Mutual had terminated Miller's contract on July 7, 1966. The fund paid into court, and the amounts paid thereafter, have reflected payment of renewal commissions at the reduced rates. The issue as to the scope of interpleader was briefed and argued before me. By opinion and order dated August 30, 1973 (Document No. 195), 362 F.Supp. 1398, I ruled that this interpleader proceeding would be limited to determining whether Mass. Mutual has made payments to the fund in accordance with the terms of the agreement between it and Miller as expressed on the face thereof; a determination of the amounts and priority of claims to the fund paid and to be paid; a resolution of Mass. Mutual's right to withhold and set off certain amounts from payments due Miller; and assessment of proper charges and counsel fees against the fund. It was further noted in the Opinion (362 F.Supp. at 1405):

"With the proceedings so limited, the interpleading party, Mass. Mutual, will be discharged from liability only to the extent of the amounts paid and to be paid, and Miller and any claimant will be free to assert any other claims they have against Mass. Mutual in an appropriate forum."

In fact, Miller had already filed a separate suit in this court (Gordon S. Miller v. Massachusetts Mutual Insurance Company, Civil Action No. 72–1185, assigned to the individual calendar of Ditter, J.) seeking damages from Mass. Mutual for alleged wrongful termination of his contract. In this interpleader proceeding, I have accepted the *fact* of termination of the contract by Mass. Mutual and have expressly ruled that whether such termination by Mass. Mutual gives rise to a claim for damages is beyond the scope of this proceeding. The findings hereinafter made, therefore, must be viewed in light of the limited scope of this proceeding.

Of the original claimants named as defendants, two, Curtiss National Bank and Pioneer Leasing Corp., have withdrawn their claims with prejudice, leaving as claimants to the fund Central Penn National Bank, Industrial Valley Bank, Franklin National Bank, Mercantile Financial Corporation, Marine Midland Grace Trust Company, and Isadore and Dorothy Mokrin. Also named as defendants in these proceedings were Gordon S. and Frances Miller, his wife. No claim has been filed by them, but it has been stipulated that if anything is left in the fund after the satisfaction of all claims, it is the property of Gordon S. Miller.

After the institution of this suit, two Florida attorneys, Guilmartin and Bartel, were permitted, by stipulation, to intervene as defendants, but when the case was called for trial, their claim was dismissed for lack of prosecution.

The matter was tried on October 3, 4, 9, 10 and 11, 1973. At the conclusion of the presentation of evidence, and after summations by counsel, certain oral findings of fact were delivered from the bench for the guidance of counsel in their submissions of additional requests for findings of fact and conclusions of law. To the extent that the written findings hereinafter set forth differ from the oral findings, the written findings supercede and replace the oral findings, the court having since had the benefit of further review of exhibits, the requests and briefs of the parties, and the transcript of the trial testimony.

Prior to and during the trial numerous references were made to the need for or desirability of a further audit or a more detailed accounting by Mass. Mutual. The parties have since stipulated, however, (Document No. 214) that they do not contest the factual or mathematical accuracy or the accounting methods of Mass. Mutual's accounting to the court for the various amounts paid by it into the registry of the court or to Central Penn and have waived the right to any further audit or detailed accounting.

Upon pleadings and proof, the court makes the following

## FINDINGS OF FACT

### Relationship between Mass. Mutual and Miller

1. Massachusetts Mutual Life Insurance Company (Mass. Mutual) is a Massachusetts corporation with its principal office in Springfield, Massachusetts.

2. Gordon S. Miller (Miller) is an individual who resides in Delaware County, Pennsylvania.

3. Under date of April 1, 1951, Mass. Mutual and Miller entered into a General Agency contract under the terms of which Miller was designated to maintain and operate a General Agency for Mass. Mutual in Philadelphia, Pennsylvania, for a territory covering parts of Pennsylvania and New Jersey and the entire state of Delaware. On the date of execution the contract contained several letters of amendment, and from time to time thereafter additional letters of amendment were executed. The contract consists of Exhibits P–1 and CP–1, 2 and 3.

4. From and after his appointment as General Agent, Miller maintained his office for the transaction of the business of the General Agency in Philadelphia, Pennsylvania.

5. Under the General Agency contract, Mass. Mutual agreed to provide an office for the General Agency and to pay the rent therefor. Miller undertook and agreed to run the General Agency and to be responsible for, or to perform, inter alia, the following:

(a) Recruiting, hiring, training and supervising agents to sell Mass. Mutual's policies of insurance.

(b) Hiring, supervision, and responsibility for the acts of office and clerical employees of the General Agency.

(c) Receipt and forwarding to Mass. Mutual of premiums and renewal premiums collected by and through the General Agency.

(d) Responsibility for the expenses of operating the General Agency, including the expenses for clerical personnel furnished by Mass. Mutual.

6. In carrying on the business of the General Agency, Miller's relationship with Mass. Mutual was that of an independent contractor, not an employee. This ultimate finding is based upon the following underlying findings:

(a) A General Agency performs two essential functions: the first, and more important, is the solicitation of business; the second is the servicing of policies and processing of premiums and commissions.

(b) The servicing of policies and the processing of premiums and commissions at Miller's Agency was handled by clerical personnel who were hired by, and were employees of, Mass. Mutual, but the salaries, social security and unemployment insurance taxes, and costs of participation in pension plans for such employees were charged to Miller's account by Mass. Mutual. Mass. Mutual exercised control over the hours of work of clerical employees.

(c) Mass. Mutual did not supervise or control the method by which Miller conducted the solicitation of insurance business.

(i) Except for financed agents, Miller was free to hire and discharge agents, district managers and non-clerical assistants without approval of or interference by Mass. Mutual.

(ii) Mass. Mutual reserved the right to approve financed agents before they were hired. Financed agents are those to whom, for a period of time, a specified salary is paid in lieu of commissions. Under such arrangements, Mass. Mutual undertook to be responsible for a portion of the loss resulting from the amount by which such salary exceeds earned commissions.

(iii) Although Mass. Mutual furnished the standard form contracts entered into by General Agents with their agents and district managers, Miller as General Agent was free to vary the terms of such contracts as to rates of commissions.

(iv) Mass. Mutual had no control over the hours of work of Miller or any of the agents employed by him.

(d) Miller's income was derived almost exclusively from the efforts of persons employed by him. He was in the position of realizing a profit or loss in the operation of the General Agency from the manner in which he selected, trained and supervised the efforts of those who performed the sales functions for him.

(e) In addition to as many as 75 agents working directly for and under him, Miller derived income from sales of insurance by as many as 600 general insurance brokers selling insurance for his General Agency.

(f) Miller invested large sums of money to finance his agents and to promote his General Agency, paying for advertising, entertainment, training, contests and for advances and guarantees to agents.

(g) On his income tax return Miller reported the income from his General Agency as "Income from Business" not as "Wages, salaries, etc." Some of the expenses of operating Miller's agency were reimbursed by Mass. Mutual. To the extent such expenses were not reimbursed, they were deducted as expenses in determining the net profit from his General Agency.

(h) (i) Although Mass. Mutual maintained a qualified pension plan for its employees, Miller and other General Agents were not eligible to, and did not, participate in such plan. Although there were several alternative plans open to General Agents upon retirement, each took the form of a "levelling out" agreement, under which the General Agent could exchange his vested right to receive uncertain commissions on the remaining life of policies which had been written by his Agency for a sum certain each month. In effect, the General

Agent could use his vested right to future commissions to purchase an annuity from Mass. Mutual.

(ii) Mass. Mutual did not withhold federal income tax or social security for Miller or other General Agents, although it did make such withholdings for its employees.

7. The General Agency contract between Mass. Mutual and Miller provides for the payment of first year and renewal commissions at specified rates for different types of policies. The contract further provides for reduction in the rate of renewal commissions payable to Miller upon termination of the 'General Agency contract for any reason other than Miller's death. Mass. Mutual terminated the General Agency contract with Miller on July 6, 1966.

8. The provision for payment of renewal commissions at a reduced rate upon termination of the General Agency contract is, on the face of the agreement, reasonably related to the General Agent's reduced services and responsibility in the operation of the General Agency.

9. That portion of the General Agency contract which has been marked as Exhibits CP–1, 2 and 3 relates to development credits. Development credits are a form of bonus commissions payable for especially profitable types of insurance business and are designed to foster and stimulate development of desirable new business.

10. By the terms of the documents granting them, development credits terminate upon termination of the General Agency.

11. The provision for termination of development credits upon termination of the General Agency contract is, on the face of the agreement, reasonably related to the General Agent's inability to further foster and stimulate development of new business.

### Claimants and Their Claims

12. Central Penn National Bank (formerly Central-Penn National Bank of Philadelphia) is a national banking association organized and doing business under the provisions of the National Bank Act. It has its principal office and place of business in Montgomery County, Pennsylvania.

13. On June 3, 1963, Miller borrowed $650,000 from Central Penn, for which he executed a demand collateral note (Exhibit CP–9). Prior to the execution of the demand collateral note, the parties had agreed (as set forth in letter dated February 15, 1963, Exhibit CP–14(f)) that the loan would be for three years with interest payable monthly, with payments in the amount of $10,000 to be made on account of principal every three months, with the entire balance of principal due and payable at the end of three years. It was further agreed that the rate of interest would be $\frac{1}{2}\%$ above the prime interest rate.

(a) In June 1963 the prime interest rate was $4\frac{1}{2}\%$ and interest payable on the Miller loan was 5%.

(b) In December 1965 Central Penn notified (Exhibit CP–14(b)) Miller of an increase in prime rate to 5% and of the consequent increase of interest on his loan to $5\frac{1}{2}\%$.

(c) On March 10, 1966 the prime rate again increased (to $5\frac{1}{2}\%$) but Central Penn did not notify Miller of the change in prime rate and the resultant increase in the rate of interest on his loan to 6%, until July 1966 (Exhibit CP–14(a)). Central Penn claims interest at the 6% rate commencing only with the month in which it gave notice of the change, July 1966.

14. As collateral security for the payment of the aforementioned note, Miller executed and delivered to Central Penn a document entitled "Collateral Assignment of Insurance Renewal Commissions," dated April 25, 1963 to which Mass. Mutual affixed its consent on June 5, 1963 (Exhibit P–6). Financing statements were duly recorded by Central Penn in June 1963 in the offices of the Prothonotary of Philadelphia County, of the Prothonotary of Delaware

County, and of the Secretary of the Commonwealth. Continuation statements were filed in Philadelphia County and in Delaware County in April 1968, May 1968 and February 1973, and in the office of the Secretary of the Commonwealth in April 1968 and February 1973 (Exhibits CP–15, 16 and 17).

15. Following its execution of consent to the Collateral Assignment, Mass. Mutual made payments to Gordon Miller and to Central Penn until the end of January 1966, when such payments were discontinued following the occurrence of certain events which will be hereafter related. The payments were deposited in a Special Checking Account of Miller at Central Penn and parts of such payments were used by Miller to make payments for interest and on account of principal of the loan from Central Penn.

(a) The last payment made to Miller and Central Penn by Mass. Mutual pursuant to the Collateral Assignment was by check dated January 31, 1966 (Exhibit P–20(d)) in the amount of $11,352.81 for commissions.

(b) Payments to central Penn for interest and principal on the loan were recorded by Central Penn on its Liability Ledger (Exhibit CP–10).

(c) The last payment made to Central Penn on account of the loan was in the amount of $2,568.87 on February 2, 1966 for interest due through December 31, 1965.

(d) The principal balance remaining due to Central Penn, after crediting the aforementioned payments, was $550,000, plus interest.

16. Lehigh Valley Trust Company was a banking corporation organized and doing business under the laws of the Commonwealth of Pennsylvania, with its principal office and place of business in Lehigh County, Pennsylvania. On December 20, 1968 Industrial Valley Bank became the successor by merger to Lehigh Valley Bank. (Hereafter the merged and the surviving banks will be referred to as IVB).

17. On June 30, 1965 Miller borrowed the sum of $80,000, and on August 10, 1965, he borrowed the further sum of $20,000, from IVB. Miller and his wife, Frances G. Miller, signed notes promising to repay, on December 30, 1965 and November 10, 1965, respectively, the said amounts to IVB with interest at 6% (Exhibit L–1).

18. On May 6, 1964 to secure payment of any present or future indebtedness due from him to IVB, Miller executed and delivered to IVB a "Collateral Assignment of Renewal Commissions" due and to become due him from Mass. Mutual under the contract dated April 1, 1951, as amended. The Collateral Assignment to IVB, which was expressly made subject to the prior assignment to Central Penn, was consented to by Mass. Mutual (Exhibit P–7).

19. No financing statement reflecting the security interest created by the Collateral Assignment of Renewal Commissions to IVB was ever filed.

20. No payments have been made in reduction of the abovementioned loans from IVB and there remains due and owing to IVB on account of the loans to Miller, the sum of $100,000, with interest at 6% from August 10, 1965.

21. (a) Mercantile Financial Corporation is a Delaware Corporation with its principal office in Chicago, Illinois.

(b) On October 22, 1965 judgment by confession was entered on a note against Miller and one Jules Gomez, jointly and severally, in the amount of $165,021.12 in favor of Mercantile Financial Corporation in Civil Action No. 39086 in the United States District Court for the Eastern District of Pennsylvania (Exhibit MFC–1).

(c) A writ of execution attaching "all debts, contract liabilities and sums owing Gordon S. Miller by Massachusetts General (sic) Life Insurance Company (other than wages and salary)" was served on Mass. Mutual at the Philadelphia Agency by the United States Marshal on January 6, 1966 (Exhibits MFC–2 and 3).

(d) By Order dated March 27, 1969 the judgment theretofore entered in favor of Mercantile Financial Corporation was, for a consideration recited in said Order, reduced to $100,000, with interest to run thereon from the date of the Order.

22. (a) Franklin National Bank is a national banking corporation with its principal office and place of business in Nassau County, New York. Pursuant to a merger as of June 30, 1967, it is the successor in interest to Federation Bank and Trust Company (hereafter the merged and the surviving banks will be referred to as Franklin).

(b) On February 7, 1966 Franklin instituted a suit in equity against Miller in the Superior Court of Suffolk County, Massachusetts (No. 85075 Equity) based on indebtedness due on a note dated September 22, 1965 in the principal amount of $50,000. On the same day a temporary restraining order issued in that action restraining Mass. Mutual from assigning, transferring or otherwise disposing of any amounts due or to become due to Miller under his General Agency contract with Mass. Mutual.

(c) On February 15 and 21, 1966 interlocutory decrees were entered in that action continuing the temporary restraining order in force until final determination of the suit, except that it was modified to be effective only until the amount of $62,000 was accumulated, excluding from the order commissions and payments due or to become due to agents and employees of Miller, and excluding all amounts payable to creditors whose claims had priority over Franklin's, and permitting, until further order of that court, payments to Central Penn under the assignment dated April 25, 1963 (Exhibit F–1).

23. (a) Marine Midland Grace Trust Company of New York (Marine Midland) is a New York corporation with its principal place of business in New York City, New York.

(b) Under date of October 1, 1965 Miller and his wife, Frances G. Miller, executed a promissory note to Marine Midland in the principal sum of $44,397.03, payable six months after date, with interest at 6%.

(c) The note became in default and in accordance with the provisions thereof, judgment by confession was entered on June 29, 1966 in the amount of $48,003.-52, together with costs, in the United States District Court for the Eastern District of Pennsylvania, (Civil Action No. 40569).

(d) A copy of the judgment was registered in the United States District Court for the District of Massachusetts on July 15, 1966 at E.B.D. 66–103. On April 7, 1967 a Petition to Reach and Apply was filed in the United States District Court for the District of Massachusetts (C.A. 67–300–W) naming as respondents Miller and Mass. Mutual, seeking to reach and to apply amounts due Miller under his General Agency contract with Mass. Mutual to satisfy the judgment in favor of Marine Midland. The Petition to Reach and Apply was dismissed, by stipulation, on May 7, 1968 (Exhibits MM–1, 2 and 3).

(e) The amount due Marine Midland has been reduced by payments totalling $13,646.49 on account of the judgment, leaving a remaining balance due on the judgment of $34,357.03, plus interest.

(f) By indenture dated December 3, 1969 Marine Midland assigned the judgment to Harold F. MacNair of Penfield, Pennsylvania.

24. (a) Isadore Mokrin and Dorothy Mokrin (Mokrin) are individuals, husband and wife, who reside in Margate, New Jersey.

(b) On March 17, 1967 Mokrin entered a judgment by confession against Miller in the amount of $221,056.03 in the Court of Common Pleas, Philadelphia County, Pennsylvania, March Term, 1967, No. 1002. A Writ of Execution was served on Mass. Mutual in Philadelphia on March 20, 1967 attaching all accounts, credits, moneys and commissions due and to become due from Mass. Mutual to Miller (Exhibits M–2A and 2B).

(c) On or about April 24, 1967 Mokrin declared upon the aforementioned judgment of the Court of Common Pleas of Philadelphia, Pennsylvania, in the District Court of Springfield, Commonwealth of Massachusetts (No. 192597), and pursuant thereto a Trustee Writ was served on Mass. Mutual on April 24, 1967 (Exhibits M–3A and 3B).

25. On January 6, 1966 a Writ of Execution was served on Mass. Mutual pursuant to the judgment obtained by Mercantile Financial Corporation in the Eastern District of Pennsylvania in C.A. 39086, as detailed in Finding No. 21(a)–(d).

26. As a result of the service upon Mass. Mutual of the restraining order and interlocutory decrees issued by the Superior Court of Suffolk County, Massachusetts, as detailed in Finding No. 22(a)–(c), Mass. Mutual, on February 23, 1966, notified Central Penn that it would no longer make payments to it under the assignment until Central Penn made formal demand upon Mass. Mutual for payment and established the priority of its claim (Exhibit CP–14(d)).

27. On February 25, 1966 Central Penn made formal demand for payment (Exhibit CP–14(c)), but Mass. Mutual nevertheless made no further payments, and withheld and retained in its own possession commissions due and payable under the General Agency contract with Miller until July 27, 1967, when the accumulated amount thus withheld, $173,845.39, was paid into the registry of this court upon the filing of the within Complaint in Interpleader.

28. (a) Mass. Mutual had the use and benefit of the sums of money withheld during the period of approximately eighteen months prior to the payment thereof into the registry of the court and, as a matter of equity, it should be charged a fair and reasonable rate therefor.

(b) To the extent that the payment of such sums to Central Penn would have reduced Central Penn's interest charges, the withholding of such sums has caused loss to the fund.

(c) A fair and reasonable charge for the use of the sums of money so withheld by Mass. Mutual is the rate of interest payable on the Miller loan to Central Penn during the periods of such withholdings, i. e. 5½% until July 1, 1966, and 6% from July 1, 1966 until July 27, 1967.

29. By stipulation dated February 29, 1968 and amended by Order dated March 18, 1968 in these proceedings (Documents Nos. 56 and 58), the parties agreed that the fund of $173,723.31 in the registry of the court (the fund paid in, $173,845.39, less reimbursement of costs allowed to Mass. Mutual, $122.08), and the additional sums thereafter determined by Mass. Mutual to be due and payable to Miller be paid over to Central Penn and, pending final determination of entitlement to the fund, Central Penn would treat all such payments as payments on account of the principal of the obligation owed it by Miller. It was further stipulated that if Central Penn be determined to be entitled to the sums thus received, no interest would be deemed to have accrued on that portion of the Miller obligation to Central Penn thus paid; but if it be determined that Central Penn pay over any portion of the sums so received, it would pay 5% interest on the amounts to be paid over, and interest on Miller's obligation to Central Penn would be deemed to have accrued in accordance with the terms of the loan agreement.

30. (a) From the inception of the instant interpleader through July 26, 1973, pursuant to the aforementioned stipulation Central Penn received the sum of $576,038.09 (Exhibit CP–6) which it applied to the Miller obligation as set forth in detail in the schedule # 2 which Central Penn prepared and offered as Exhibit CP–7. The court accepts and adopts Exhibit CP–7 as an accurate statement of account with the ex-

ception of the amount claimed as counsel fee, which claim will be treated separately hereafter.

(b) A brief summary of the account set forth in Exhibit CP–7 discloses the following:

| | |
|---|---|
| (1) Principal balance due on note | $550,000.00 |
| (2) Interest on balance of $550,000 from 1/1/66 to 7/1/66 at 5½% | 15,209.07 |
| (3) Interest on balance of $550,000 from 7/1/66 to 3/19/68 at 6% | 57,475.02 |
| (4) Interest on declining balances of principal, after application of payments received pursuant to stipulation, from 3/19/68 to 1/23/73 | 43,380.58 |
| | $666,064.67 |
| Less: Receipts through 7/26/73 | 576,038.09 |
| Balance due on principal and interest | $ 90,026.58 |

—◆—

31. It was stipulated at trial (N.T. 3–116) that $15,000 is the fair and reasonable value of the legal services expended on Central Penn's behalf from February 1966 until the date of trial in its efforts to collect from the Collateral Assignment of Commissions the balance of the amounts due it by Miller. The stipulation was entered into without prejudice to the right of any party to contest Central Penn's right to recover the expense of legal fees.

32. Central Penn has been an active and necessary participant in these interpleader proceedings and has reasonably incurred and paid expenses in excess of $15,000 for legal services in attempting to effect collection of Miller's obligation through the Collateral Assignment of Commissions. Central Penn has maintained throughout that its priority is patent and sought, unsuccessfully, an early declaration of its prior and superior claim to the fund. The demand collateral note between Miller and Central Penn provides for the payment of the expenses for legal services and counsel fees for collection (Exhibit CP–9).

33. Collection fees are amounts payable by Mass. Mutual to Miller for collecting premiums on policies as to which Miller is not entitled to receive commissions. Such fees are not commissions covered by the Collateral Assignment of Commissions. Exhibit P–3, Column 8 reflects that $434.75 of the amounts paid into the fund are for collection fees.

34. (a) As noted in Finding No. 21(c), Mass. Mutual was served on January 6, 1966 with a writ of execution issued out of the Eastern District of Pennsylvania on the judgment of Mercantile Financial. Notwithstanding service of the writ, Mass. Mutual thereafter, on January 31, 1966, issued its check to Central Penn (pursuant to the assignment) in the amount of $11,352.81 in payment of January commissions due Miller.

(b) Mass. Mutual failed to inform Central Penn that it had been served with a writ of execution. In issuing the payment without notice of the attachment, Mass. Mutual acted at its peril.

(c) Of the payment so made, only $2,568.89 was applied by Central Penn to Miller's obligation. (Interest payment February 2, 1966, Exhibit CP–10). Mass. Mutual's failure to comply with the court process resulted in a loss to the fund in the amount of $8,783.92 from January 31, 1966.

*Mass. Mutual—Setoffs*

35. (a) Paragraph 14 of the basic General Agency Agreement provides, in part

". . . Company shall have a lien against commissions which are or may be payable hereunder: for all debts, obligations and liabilities of said General Agent to said Company . . . and said Company may offset any such amounts against any commissions which are or may be payable hereunder . . . ."

(b) Paragraph 6 of unnumbered amendment dated April 1, 1951 (following in order the amendment numbered Form C400–A) relating to furnishing of certain clerical employees by Mass. Mutual to Miller, provides

"6. That the Company shall have the right to apply any commissions which may become due and payable to the undersigned from the Company on account of . . . any obligation or liability herein assumed by the undersigned."

36. By terms of the contracts between Miller and his agents, on forms of contract furnished by Mass. Mutual, upon termination of the General Agent's contract, Mass. Mutual is obligated to pay to the agents all commissions which may have accrued prior to termination and as may accrue after termination.

37. By the Form C400–A amendment dated April 1, 1951, to the General Agent's contract, Miller authorized Mass. Mutual to pay to his agents any remuneration due or thereafter to become due from him as General Agent to them, and to offset such payments against commissions due him.

38. By the terms of District Manager Agreements entered into by Miller on forms furnished by Mass. Mutual, Miller authorized the company, in the event of termination of the General Agency contract, to pay to District Managers commissions to which they were entitled from Miller and to offset such payments against commissions due Miller under the General Agency contract.

39. Under Mass. Mutual's District Manager plan, district managers appointed by the General Agent were paid a salary and, in addition, were entitled to receive a stated percentage of the first year commissions on policies sold by agents working under the District Manager. Mass. Mutual and the General Agent each agreed to bear one-half of the expense of the salary and commissions payable to the District Managers.

40. Mass. Mutual gave to its General Agents (as specified in its General Agents manual) a development clerk allowance at the rate of $1.20 per $1,000 of net production. Payments were made periodically. From time to time adjustments were made to reflect the correct allowance after review of actual net production compared to the amounts of periodic payments.

41. From time to time an agent would be financed, i. e. he was paid a salary against which commissions were retained. Mass. Mutual and the General Agent shared the expense of such arrangements and, in the event of a loss, they shared the amount of the loss, the percentages of their respective shares depending upon the length of the agent's employment.

42. Mass. Mutual furnished basic telephone service to Miller and his agents, but the agents and Miller were responsible to bear the expense of, and to reimburse Mass. Mutual for, all toll calls.

43. Supplies required for the operation of Miller's General Agency were purchased from Mass. Mutual and billed to Miller.

44. Herman Levine, one of Miller's agents, maintained a separate office. Miller, as General Agent, was responsible for the expenses of that office. Mass. Mutual gave Miller an allowance of $1.50 per $1,000 of policy sales from that office toward that expense.

45. Pursuant to the various agreements and arrangements between them, Mass. Mutual was entitled to offset the

following items in the amounts set forth against commissions due Miller after termination of the General Agency contract.

(a) *Agents' Commissions*

|  |  |
|---|---:|
| (i) McBratney—a former general agent. His contract with Miller called for commissions 1% higher than regular agent's commissions. Amounts paid at the higher rate | $ 1,741.37 |
| (ii) Pension Consultants, Inc. | 895.90 |
| (iii) Walter Burns | 3,947.75 |
| (b) Telephone toll calls through 7/1966 | 6,593.66 |
| (c) Supplies | 4,919.52 |
| (d) Adjustments for overpayment of development clerk allowance for periods prior to 7/7/66 | 3,277.38 |
| (e) Miller's share (55%) of loss on financing of new agent—Meryl Moskowitz | 692.09 |
| (f) District Manager's compensation—amount paid by Mass. Mutual to pay Miller's half of reimbursement to Maury Goosenberg for period September 1964 to June 30, 1966 | 8,786.65 |
| (g) District Manager compensation paid to Goosenberg, Kavan and Lobly after July 1966, but for deferred 1st year commissions on business written while Miller's contract was in force | 1,625.94 |
| (h) District Manager allowance, Miller's share for period 1/1/66–7/7/66 | 1,408.52 |
| (i) Herman Levine—office expense for period 1/1/65–7/7/66 which Miller had failed to pay | 849.00 |
| (j) Group insurance premiums—premiums on agents' group hospitalization policies—collected by Miller but not remitted to company | 5,301.54 |
| (k) Agents' contribution to pension plan | 81.41 |
| | $40,120.73 |

*Credit Items*

|  |  |  |
|---|---:|---:|
| Credit on agents' supplies returned | $4,383.76 | |
| Reimbursement group premiums | 72.39 | |
| Adjustment-professional Liab. Bonds | 61.47 | 4,517.62 |
| NET OFFSET | | $35,601.11 |

———◆———

46. Miller incurred telephone toll charges totalling $581.93 for the period from October 1966 through April 1967. Since these charges were incurred after Miller's General Agency contract with Mass. Mutual had been terminated, Mass. Mutual is not entitled to setoff that amount against the fund.

*Mass. Mutual Claim for Counsel Fee*

47. Without conceding Mass. Mutual's entitlement to recover counsel fees, the parties have stipulated that Mass. Mutual has incurred expenses for legal services as detailed in the affidavit (Exhibit P–23) of William Kennedy, Es-

quire, that the amounts of the legal fees are fair and reasonable, and are in accordance with the charges of Mr. Kennedy's law firm and of other law firms in the City of Philadelphia. The general categories of services, and the expenses incurred in connection with each is as follows:

| | | |
|---|---|---|
| (a) | Proceedings which led up to the initiation of the interpleader action | $ 1560.00 |
| (b) | Initiation of the interpleader action | 600.00 |
| (c) | Subsequent dealings with attorneys for defendants involving extensions of time, additional parties, answers to complaint in interpleader, complying with Judge Fullam's July 27, 1967 order, pleadings in interpleader and stipulations concerning future handling of escrow funds | 782.50 |
| (d) | Services concerning the continuing accounting and depositing into court (or to Central Penn) of renewal commissions | 2,337.00 |
| (e) | Proceedings before Judge Kraft | 460.00 |
| (f) | Pretrial conferences conducted by Judge Luongo | 1,295.00 |
| (g) | Dispute over scope of the interpleader | 5,715.50 |
| (h) | Preparation for and trial of the accounting stage of the trial | 3,380.00 |
| (i) | Preparation of witnesses and information for and attendance at trial of the independent contractor versus employee stage of the trial | 845.00 |
| (j) | Preparation and trial of setoff claim | 2,885.00 |
| (k) | Attendance at priorities portion of trial | 260.00 |
| (l) | Preparation of claim for attorney's fees | 604.50 |
| | Total .............. | $20,724.50 |

48. Mass. Mutual necessarily incurred costs and legal expenses in filing the interpleader proceeding, bringing the various claimants into court, and paying the sum into court. The cost of filing and serving the complaint in interpleader, the amount of $122.08, has already been awarded and paid to Mass. Mutual out of the fund. In addition, the following expenditures, in amounts stipulated by the parties to be fair and reasonable charges for such services, were incurred:

| | | |
|---|---|---|
| (a) | initiation of the interpleader action | $ 600.00 |
| (b) | subsequent services through and including stipulations concerning handling of funds in escrow | 782.50 |
| (c) | accounting and depositing of funds | 2,337.00 |
| | | $3,719.50 |

49. Mass. Mutual's interest in this interpleader has far exceeded that of a disinterested stakeholder. Although much of its participation in this proceeding was at the court's request, and although it has prevailed in most of the

contentions it has espoused, nevertheless in so participating Mass. Mutual was advancing its own interests, rather than the interests of the fund. For example:

(a) in proving its right to make set-offs against the fund, Mass. Mutual was, in a real sense, a claimant to the fund;

(b) in limiting the scope of the interpleader, it advanced its purpose to do battle with Miller over an alleged breach of contract in a separate proceeding;

(c) at trial, the issue as to whether Miller was an independent contractor or employee had an important bearing on the rights of some of the claimants to the fund. It was the responsibility of the claimants to prove their respective contentions, calling Mass. Mutual's officials and employees as witnesses, if required. Mass. Mutual's active participation, through its counsel, was apparently for some benefit it hoped to derive from a determination of the issue, perhaps for the purposes of Miller's separate suit against it for damages;

(d) legal services expended on Mass. Mutual's behalf in the handling of various claims and attachments against it prior to interpleader are not chargeable to the interpleader proceedings.

50. Some of the confusion as to the relationship between Mass. Mutual and Miller, and at least some of the legal proceedings which have taken the time of the court and counsel, were attributable to Mass. Mutual's failure to attach to the complaint in interpleader its entire contract with Miller. Mass. Mutual has failed to offer a satisfactory explanation for its failure to do so.

## DISCUSSION

Although this interpleader action necessitated an extended trial, the legal issues to be resolved are few and relatively straightforward.

■ Throughout this litigation, several claimants have argued that certain sections of Miller's General Agency contract constituted forfeiture provisions which should not be enforced by the court. The challenged sections provide that upon termination of Miller's contract his right to receive development credits would terminate and the renewal commissions payable to him would be reduced.

Forfeiture contemplates the loss of a "vested right." 17A C.J.S. Contracts § 406. But a General Agent such as Miller has no vested right to receive the full amount of renewal commissions. "The weight of authority sustains the view that the commissions upon renewal premiums are not simply payment for securing the insurance but compensation for other services in the prosecution and preservation of the company's business; and, accordingly, if the agent is discharged for cause, or leaves voluntarily, the company is under no further liability in respect to the renewal premiums." 4 Williston on Contracts, § 1030, quoted in Insley v. State Mutual Life Ass'n., Co., 334 Pa. 368, 5 A.2d 544 (1939). Given that reasoning, it follows *a fortiori* that the courts have also given effect to contractual provisions that in the event of termination the insurance company may reduce the renewal commissions. See, e. g., Merrill v. Continental Assurance Co., 200 Cal.App.2d 663, 19 Cal.Rptr. 432 (1962); Gilbert v. Equitable Life Ins. Co., 239 Cal.App.2d 895, 49 Cal.Rptr. 187 (1969); and cases cited in 36 A.L.R.3d 958, 992.

The justification for terminating development credits when the employment relationship ends is even more obvious. Since they are, in effect, bonus commissions designed to reward the writing of a particularly lucrative type of insurance business and to spur further development of profitable new business, they should obviously be payable only to agents still in a position to attract business. In sum, both of these provisions are reasonably related to the General Agent's termination of employment [Findings 8 and 11] and neither constitutes a forfeiture or penalty.

The remaining issues deal with the claims and priorities of the competing parties. It is uncontested that all re-

maining participants in this interpleader have valid claims against Miller for commissions owing to him from Mass. Mutual. Because of the earlier ruling that Mass. Mutual was justified in paying into the fund commissions at reduced rates after terminating the General Agency contract, and because the commissions owing to Miller on that basis will be clearly insufficient to satisfy all of the claims, the main thrust of this trial has been to establish the order of priorities among Miller's creditors.

Before that determination can be made, it is necessary to decide what law governs the ranking of the creditors' claims. Article 9 of the Uniform Commercial Code, 12A P.S. § 9–101 et seq., governs all transactions "intended to create a security interest in personal property . . . including goods, documents, instruments, general intangible, chattel paper, accounts or contract rights." 12A P.S. § 9–102(1)(a). In this case, two of Miller's creditors (Central Penn and IVB) have security interests. However, § 9–104 exempts from the coverage of Article 9 any "transfer of a claim for wages, salary or other compensation of an employee." It was the possible impact of § 9–104 which undoubtedly prompted Judge Kraft's conclusion that Miller's precise employment status—independent contractor or employee—was an issue of fact for trial. The relative priorities between the creditors will vary depending on whether Article 9 governs, basically because IVB's position is vastly different under Article 9 than it would be under state contract law.

Whether an individual is an employee or an independent contractor can be decided only after thorough examination of all the relevant circumstances. See, e. g., Swartz v. Eberly, 212 F.Supp. 32 (E.D.Pa.1962). In this case, the competing claimants worked painstakingly to adduce at trial a thorough and detailed picture of Miller's relationship as a General Agent with Mass. Mutual. It seems to me clear that Miller was an independent contractor, rather than an employee.

While under relevant precedents no one factor can be deemed decisive, the "basic inquiry" focuses on the scope of the employer's control: does he maintain control over the *means of accomplishment* or is he merely concerned with his agent's *results*? e. g., Vaughan v. Warner, 157 F.2d 26 (3d Cir. 1946). If the agent can "proceed by his own initiative" to reach desired results, the inference is strong that he operates as an independent contractor. If, however, the employer exerts control or the right to control with respect to the physical conduct of performance, the agent is properly deemed to be an employee. See, e. g., George v. Nemeth, 426 Pa. 551, 233 A.2d 231 (1967); Green v. Independent Oil Co., 414 Pa. 477, 201 A. 2d 207 (1964).

It is evident that Miller operated in the sales function with an extraordinary degree of autonomy. He was free to hire and fire agents and district managers without approval or interference by Mass. Mutual [Finding 6(c)(i)]. Although the company furnished a standard form contract to him, he could freely vary the terms, at least with respect to the rates of commissions [Finding 6(c)(iii)]. Even more significant, in light of the specific question of whether his earnings can realistically be considered "wages," Miller derived his income almost exclusively from the efforts of 75 agents and as many as 600 general insurance brokers selling for his General Agency [Finding 6(c)(iv)]. He borrowed and invested large sums of money to promote his General Agency [Finding 6(f)]. In sum, I am satisfied that Miller was an independent businessman who derived his income from the efforts of others, and who was free to determine his own manner and means of training and directing the efforts of those who generated income for him. He was by no means an employee working for "wages." Accordingly, Article

9 will govern the ranking of Miller's creditors as claimants to the fund.

■ Central Penn's entitlement to first priority among the claimants is, in the main, undisputed. Central Penn made its loan to Miller in June 1963, almost a year before loans were made by any of the other claimants. More important, Central Penn obtained an assignment of, and a security interest in, Miller's commissions and perfected the security interest that same month by filing financing statements as required by § 9–302.[1] Excepting under circumstances not here relevant, a perfected security interest takes priority over an unperfected security interest and "cannot be defeated in insolvency proceedings or in general by creditors." Uniform Commercial Code Comment 1 to § 9–301. Consequently, Central Penn's claim in the amount of $666,064.67 as summarized in Finding 30(b), is first in time and first in right against the fund insofar as the fund represents commissions due and payable to Miller. Furthermore, as provided by the terms of the demand collateral note between Central Penn and Miller [Finding 32], Central Penn is entitled to recover counsel fees from the fund. The parties have stipulated that $15,000 is a fair and reasonable amount for the legal expenses incurred by Central Penn [Finding 31]. Central Penn has received (through July 26, 1973) payments totalling $576,038.09 which, with one minor exception,[2] it is entitled to retain and apply to the amounts due it. After the application thereof, there remains due to Central Penn a balance of $150,026.58 [3] to which

it is entitled to apply future payments due Miller from Mass. Mutual until the obligation is satisfied.

IVB's claim is second in time to Central Penn's, dating from 1964. However, IVB did not perfect its security interest as required by § 9–302. "An unperfected security interest is subordinate to the rights of," inter alia, "person[s] who becomes a lien creditor without knowledge of the security interest and before it is perfected." § 9–301(1)(b). "A 'lien creditor' means a creditor who has acquired a lien on the property involved by attachment, levy or the like . . . ." § 9–301(3).

Unfortunately for IVB, all the remaining claimants to the fund fit the definition of "lien creditors," with the exception of Midland Marine, whose status will be discussed *infra.* Following a judgment by confession entered against Miller in favor of Mercantile Financial on October 22, 1965, a writ of execution attaching all debts, contracts, liabilities and sums owing Miller by Mass. Mutual was served by a United States Marshal on January 6, 1966. Consequently, Mercantile Financial became a "lien creditor" on that date.[4]

■ The procedural waters are somewhat muddier with respect to Franklin National Bank's claim, since Franklin did not acquire a lien on Miller's commissions by means of the conventional "attachment" or "levy." Nevertheless, I conclude that the temporary restraining order issued by the Superior Court of Suffolk County, Massachusetts, on February 7, 1966, which was later renewed

---

**1.** It should be noted that even if Miller's status had been determined to be that of an employee, and the commissions due him to be "wages," Central Penn would be entitled to priority because it had obtained an assignment of such "wages."

**2, 3.** From this sum should be subtracted $434.75 paid into the fund as collection fees. Collection fees are not commissions subject to Central Penn's security interest. Central Penn will be required to make an appropriate adjustment in its account to eliminate that item and to pay it over, with interest at

5% (see Finding 29), to the second ranking creditor, Mercantile Financial. Upon doing so, Central Penn may add that amount to the balance due it.

**4.** As noted in Finding 21, the judgment, originally entered in the amount of $165,021.12, was reduced to $100,000 by order of the Court on March 28, 1968. The reduction in the amount of the judgment did not create a new judgment and the lien of Mercantile Financial's attachment dates from January 6, 1966.

by interlocutory decrees, had the effect of making Franklin a "lien creditor." The temporary restraining order restrained Mass. Mutual from "assigning, transferring or otherwise disposing of amounts due to Miller," and the subsequent decrees continued the temporary restraining order, with the limiting provision that it would be effective only until $62,000 was accumulated, and that the amounts payable to creditors with priority over Franklin's could be paid. Section 9–301 reserves lien creditor status for those creditors who acquire a lien by invoking the judicial process. Despite the conditional nature of Franklin's lien, it suffices to qualify that claimant as a "lien creditor" as of February 7, 1966.

As for the Mokrins, they entered a judgment by confession against Miller on March 17, 1967, in the Court of Common Pleas in Philadelphia, and on March 20 a writ of execution was served on Mass. Mutual in Philadelphia attaching all accounts, credits, money and commissions due and to become due from Mass. Mutual to Miller. The Mokrins caused an attachment to issue on April 24, 1967 out of the Massachusetts courts on a declaration upon the aforementioned judgment.

■ IVB does not dispute the lien creditor status of Mercantile Financial, Franklin and the Mokrins, but it argues that they[5] were not lien creditors *without notice* of IVB's interest, as required by § 9–301(1)(b). IVB argues that the subsequent lien creditor claimants introduced no evidence showing they were without notice. This is true, but meaningful only if the court accepts IVB's argument that the burden falls on the lien creditors to prove their *lack* of knowledge rather than on IVB to prove that the lien creditors *had* knowledge of IVB's unperfected security interest. The time-honored general rule allocating burden of proof is clearly contrary, placing the burden on the party who asserts the affirmative of an issue.[6] Those courts which have considered the burden of proof question in the precise context of a § 9–301 priorities dispute have applied the general rule, placing the burden of proving the lien creditor's knowledge on the holder of the unperfected security interest. In re Komfo Products Corp., 247 F.Supp. 229 (E.D.Pa.1965); Levine v. Pascal, 94 Ill.App.2d 43, 236 N.E.2d 425 (1968). The policies underling Article 9 demand that the burden be allocated in this fashion. "The purpose of the filing requirements of the UCC, like recording requirements generally, is obviously to protect subsequent creditors who might not have extended credit had they known of an existing security interest." In re Komfo, *supra,* 247 F.Supp. at 234. This policy would be completely undermined if a holder of a security interest who has failed to file could prevail against an innocent lien creditor struggling under the burden of proving his lack of knowledge. The impetus to perfect a security interest would be sharply reduced by such a result.[7] IVB has made no showing that

---

5. IVB specifically directs its argument against the status of Mercantile Financial, but the principle applies equally to the other subsequent lien creditors.

6. The rule has been restated many times by both Pennsylvania courts and federal courts. See, e. g., Zerbe v. Miller, 16 Pa. 488 (1851); Zenner v. Goetz, 324 Pa. 432, 188 A. 124 (1936); O'Neill v. Metropolitan Life Ins. Co., 345 Pa. 232, 26 A.2d 898 (1942); Barrett v. Otis Elevator Co., 431 Pa. 446, 246 A.2d 668 (1968); Delaware Coach Co. v. Savage, 81 F.Supp. 293 (D.Del.1948); National Motor Freight Traffic Ass'n v. United States, 242 F.Supp. 601 (D.D.C.1965); Mar-

cum v. United States, 452 F.2d 36 (5th Cir. 1971).

7. In 1972, Paragraph 1(b) of § 9–301 was amended by the authors of the UCC to eliminate the knowledge requirement. As the official comment notes, "knowledge of the security interest will no longer subordinate the lien creditor to the unfiled security interest." Because Pennsylvania has not yet adopted this modification of § 9–301, my decision is based on the language of § 9–301 requiring knowledge. The amendment does serve to underscore the analysis of statutory purpose, by reflecting the desire of the formulators of Article 9 to encourage holders of security in-

Mercantile Financial, Franklin or the Mokrins had knowledge of its security interest; accordingly, it is not entitled to prevail against these subsequent lien creditors. Because of the dates on which their respective liens attached, Mercantile Financial stands first behind Central Penn, and Franklin and the Mokrins follow in that order in the priority of claims.

■■■ Although IVB is not entitled to prevail against lien creditors, its claim does take precedence over Marine Midland's. Marine Midland has a judgment against Miller, but not all "judgment creditors" are "lien creditors." A lien arises only after the judgment is enforced through the judicial process—by "writ of execution, attachment, levy or the like." § 9–301(3); William Iselin & Co. v. Burgess & Leigh Ltd., 52 Misc.2d 821, 276 N.Y.S.2d 659 (1967); Ruppert v. Community Nat. Bank, 22 A.2d 165, 254 N.Y.S.2d 341 (1964). In Marine Midland's case, its "petition to reach and apply" filed on April 7, 1967, constituted an attempt to enforce the judgment by court process sufficient for the purposes of § 9–301. Had the petition been granted, Marine Midland would have obtained a lien and qualified as a "lien creditor," but the petition was dismissed by stipulation. Under the circumstances, Marine Midland is in the position of an unsecured creditor. Its claim, being later in time, is subordinate to IVB's unperfected security interest.

■■■ There remains the question as to the extent to which Mass. Mutual should be compensated from the fund for attorney fees expended in connection with this interpleader. Under well-established principles, "it is within the discretion of the court to award the stakeholder costs including a reasonable attorneys' fee out of the deposited fund."

3A Moore's Federal Practice ¶ 22.-16(2). The general justification for granting counsel fees is that the stakeholder is helping the parties to a prompt result, and because of the "minimal work" required to institute a suit in interpleader, the fund will not be seriously depleted. See John Hancock Mutual Life Ins. Co. v. Doran, 138 F.Supp. 47, 50 (S.D.N.Y.1956). The crucial factor, however, is that the stakeholder must be a disinterested party, involved "not because of [his] wrongdoing but rather because he is the mutual target in a dispute which is not of his own making." *Moore, supra*. If the stakeholder asserts a substantial adversary position, either by contesting the correctness of the amounts deposited or by setting forth its own claim to the fund, the court should not award expenses. See, e. g., United States v. Wilson, 333 F.2d 147 (3d Cir. 1964); Klebanoff v. Mutual Life Ins. Co., 246 F.Supp. 935 (D.Conn.1965); Ferber Co. v. Ondrick, 310 F.2d 462 (1st Cir. 1962). Where the plaintiff in interpleader is an interested party, it is necessary for the court to segregate the costs incurred in performing the "stakeholder" function and award the plaintiff only those fees.[8] See, e. g., Schirmer Stevedoring Co. v. Seaboard Stevedoring Corp., 306 F.2d 188 (9th Cir. 1962) (attorney fees granted for costs of preparing complaint and details of accounting and restraining further prosecution; denied for expenses incurred to contest the sum of the fund.

Mass. Mutual argues that except for the setoff it seeks, it would have been only a nominal party to the suit. It argues further that the scope of the litigation was widened by issues injected by the other parties. But the setoff cannot be dismissed in passing. It makes Mass. Mutual a financially interested party.

---

terests to perfect by subordinating their interests if they did not do so.

8. These general principles have been almost universally applied. See, e. g., Hunter v. Fed. Life Ins. Co., 111 F.2d 551 (8th Cir. 1948); San Rafael Compania Naviera S. A. v. American Smelting & Refining Co., 327 F.2d 581 (9th Cir. 1964); Gulf Oil Corp. v. Olivier, 412 F.2d 938 (5th Cir. 1969); Beaufort Transf. Co. v. Fischer Trucking Co., 357 F.Supp. 662 (D.Mo.1973); James Talcott Inc. v. Allahabad Bank Ltd., 444 F.2d 451 (5th Cir. 1971).

It became, in effect, a claimant competing for a share of the fund. For the reasons summarized in Finding 48, I have concluded that Mass. Mutual must be viewed as an "interested party," a conclusion which sharply limits Mass. Mutual's right to be reimbursed for counsel fees expended. It is entitled to be reimbursed only for costs and legal expenses necessarily incurred by it in filing the interpleader proceeding, bringing the various claimants into court and paying the fund into court. Accordingly, Mass. Mutual will be reimbursed from the fund for the categories of services listed in Finding 48 in the total amount of $3,719.50.

The rulings made herein should render unnecessary any further legal expense for accounting and depositing of funds. The remaining payments should involve no more than the clerical and accounting services Mass. Mutual is obligated to perform, under its contract, in accounting to Miller for commissions payable. Accordingly, no allowance will be made for legal services for accounting and handling of payments to be made in the future.

## CONCLUSIONS OF LAW

1. This court has jurisdiction pursuant to 28 U.S.C. § 1335.

2. Gordon Miller was an independent contractor rather than an employee of Mass. Mutual. Commissions payable under the General Agency contract with Mass. Mutual do not constitute wages within the meaning of § 9–104 of the Uniform Commercial Code, 12A P.S. § 9–104.

3. Article 9 of the Uniform Commercial Code, 12A P.S. § 9–101 et seq., is the governing law determining priorities of the creditors' claims against the fund.

4. Among the creditors, Central Penn's claim is first in priority with respect to commissions paid and to be paid under the General Agency contract between Mass. Mutual and Miller. (Central Penn is entitled to retain payments received [through July 26, 1973] from Miller totalling $576,038.09, less $434.75 which it will be required to pay over to Mercantile Financial. There remains owing to Central Penn $105,026.58, plus $15,000 for counsel fees, toward which it is entitled to apply future payments due Miller from Mass. Mutual.)

5. The claim of Mercantile Financial is second in priority as to commissions paid and to be paid under the General Agency contract. Mercantile Financial is entitled to first priority on amounts (such as collection fees) not constituting commissions. It will have first claim against future commissions paid to Miller by Mass. Mutual after the claim of Central Penn has been satisfied.

6. The priority of the remaining creditors to future payments into the fund is as follows: Franklin National Bank, Dorothy and Isadore Mokrin, Industrial Valley Bank and Marine Midland Grace Trust Company.

7. Mass. Mutual properly offset $35,603.11 against commissions owing to Miller. It will be ordered to pay to the fund all sums which it has offset in excess of that amount, together with interest.

8. Mass. Mutual improperly withheld payment of commissions prior to the filing of the interpleader proceeding and will be required to pay into the fund the amounts so withheld, together with interest.

9. Mass. Mutual is entitled to be reimbursed from the fund (or by way of credit) in the amount of $3,719.50 for counsel fees and expenses of the interpleader proceeding.

\*   \*   \*   \*   \*   \*

Counsel shall, within ten (10) days, submit an appropriate form of Order after consultation with each other and with the Court.

## FINAL DECREE AND JUDGMENT

The Court having heretofore filed Findings of Fact and Conclusions of Law on February 12, 1974; and the Court having thereafter conferred with counsel concerning an appropriate form

of Final Decree and Judgment; and counsel having pointed out, in the course of the conference, certain inaccuracies in the Conclusions of Law theretofore filed; it is this 22nd day of February, 1974, ordered that the Conclusions of Law attached hereto and marked Exhibit A be and they are hereby substituted for the Conclusions of Law heretofore filed; and it is further

### ORDERED, ADJUDGED AND DECREED

1. The claim of defendant Central Penn National Bank formerly Central—Penn National Bank of Philadelphia (Central Penn) in the total amount of $681,064.67 is first in priority over the claims of all other parties to this action with respect to all commissions including development credits paid and to be paid under the General Agency contract between plaintiff, Massachusetts Mutual Life Insurance Company (Mass. Mutual), and defendant, Gordon S. Miller (Miller).

2. Funds in the amount of $590,803.-98, which includes:

(a) payments received through July 1, 1973, totalling $575,484.57 ($576,038.09 less $553.52 collection fees plus interest);

(b) payments received for period July 1, 1973 to September 30, 1973 in the amount of $8,215.11; and

(c) payments received for period October 1, 1973 through December 31, 1973 in the amount of $7,104.30, presently deposited with Central Penn under the terms of Stipulations of the parties approved by the Court shall be immediately turned over to Central Penn in partial satisfaction of its total claim and free and clear of the claims or interests of any party to the action.

3. Mass. Mutual shall immediately pay over to Central Penn the following amounts, minus attorney's fees allowed, which when received shall be applied by Central Penn to further reduce the balance due on its claim:

| | | |
|---|---|---|
| (a) | $ 581.93 | Improper setoff |
| (b) | 214.94 | Interest on $581.93 from January 4, 1968 at 6% per annum to February 22, 1974, $.096 per day for 2,239 days or $214.94 |
| (c) | 8,783.92 | Loss caused by failure to comply with Court process. |
| (d) | 4,219.92 | Interest on $8,783.92 at 5½% per annum from January 31, 1966 to June 30, 1966, $1.32 per day for 150 days or $198.00; and 6% per annum from July 1, 1966 to February 22, 1974, $1.44 per day for 2,793 days or $4,021.92 |
| (e) | 8,943.38 | Interest computed on a monthly basis on the amounts as they accumulated and should have been paid in the Gordon Miller escrow account Number 5316 (Exhibit P-4) at 5½% per annum from January 31, 1966 to June 30, 1966 and at 6% per annum from July 1, 1966 to July 27, 1967. |
| | $22,744.09 | Gross total with interest computed to February 22, 1974 |
| | 3,719.50 | Minus credit for attorney fees allowed to Mass. Mutual |
| | $19,024.59 | Net total to be paid to Central Penn as of February 22, 1974 |

4. Mass. Mutual shall continue to pay to Central Penn all commissions including development credits due or to be due to Gordon Miller under the General Agency contract between Mass. Mutual and Miller, which payments when received shall be applied by Central Penn to further reduce the balance due on its claim until Central Penn's claim in the amount of $681,064.67 is satisfied in full.

5. Upon application by Central Penn of the $590,803.98 referred to in paragraph 2 herein and upon receipt by Central Penn from Mass. Mutual of the $19,024.59 referred to in paragraph 3 herein there shall remain owing to Central Penn $71,236.10 on its claim.

6. Central Penn shall pay to defendant, Mercantile Financial Corporation (Mercantile) $553.52 which includes $434.75 (collection fees) plus interest at 5% per annum from April 1, 1968 to February 22, 1974 in the amount of $118.77, which amount shall be applied by Mercantile to reduce the total amount of its claim.

7. Mass. Mutual shall pay to Mercantile any further collection fees due or to be due to Gordon Miller under the General Agency contract between Mass. Mutual and Miller, which payments, if any, when received shall be applied by Mercantile to further reduce the amount of its claim.

8. Mass. Mutual shall continue to serve all parties with quarterly reports of all payments made in accordance with this Order.

9. In the event that Central Penn's total claim in the amount of $681,064.67 is paid in full and there exists further rights of Miller to receive payments of any kind under his General Agency contract with Mass. Mutual, Mass. Mutual shall pay the amount of such payments when due directly to the following claimants, in the following amounts and in accordance with the following order of priorities:

*First* to Mercantile Financial Corporation until it has received full payment of its claim in the amount of $99,446.48 ($100,000 minus $553.52 to be paid by Central Penn) plus interest at 6% per annum from March 27, 1969;

*Second* to Franklin National Bank until it has received full payment of its claim in the amount of $50,000 plus interest at 6% per annum from February 7, 1966;

*Third* to Isadore Mokrin and Dorothy Mokrin until they have received full payment of their claim in the amount of $221,056.03 plus interest at 6% per annum from March 17, 1967;

*Fourth* to Industrial Valley Bank until it has received full payment of its claim in the amount of $10,000 plus interest at 6% per annum from August 10, 1965;

*Fifth* to Harold F. MacNair (assignee of Marine Midland Grace Trust Company) until he has received full payment of his claim in the amount of $34,357.03 plus interest at 6% per annum from June 29, 1966.

10. The Court shall retain jurisdiction over the case and the parties hereto until upon application of any party hereto, the Court is satisfied that either (1) the claims of all claimants to the fund have been paid in full in accordance with the priority determined by this Order or (2) there exists no further rights of Miller to receive payments of any kind under his General Agency contract with Mass. Mutual, whichever shall first occur.

11. Mass. Mutual, upon compliance with the terms of this Final Order, is discharged from liability to the respective defendants to this action, but only to the extent of the amounts paid and to be paid by Mass. Mutual by virtue of this and previous Orders of this Court and to the extent of the setoff in the amount of $35,601.11 allowed by this Court, and Miller or any other claimant is free to assert any other claims they may have against Mass. Mutual in an appropriate forum.

12. This is a final judgment as to the rights of all the respective parties to this action to the fund currently be-

fore the Court consisting of $591,357.50 ($590,803.98 awarded to Central Penn plus $553.52 awarded to Mercantile Financial Corporation) and the rights of the respective parties to all commissions and other payments to be paid Miller under the terms or by virtue of his General Agency contract with Mass. Mutual; the Court expressly determines that there is no just reason for delaying the entry of final judgment and hereby directs that the within Order shall be entered as the Final Judgment in this case.